UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
K.S. and J.S., on behalf of L.S.,

                               Plaintiffs,

      - against -

HARRISON CENTRAL SCHOOL DISTRICT,

                               Defendant.
------------------------------------------------------------------x

**OPINION & ORDER**

No. 24-CV-6318 (CS)

Appearances:

Paul N. Barger
Barger & Gaines
Irvington, New York
*Counsel for Plaintiffs*

Sara M. Richmond
Bond, Schoeneck & King, PLLC
White Plains, New York
*Counsel for Defendant*

Seibel, J.

Before the Court are the cross-motions for summary judgment of Plaintiffs K.S. and J.S. (collectively, "Plaintiffs" or "the Parents"), (ECF No. 32), and of Defendant Harrison Central School District ("Defendant" or "the District"), (ECF No. 27). Plaintiffs bring this action on behalf of their child, L.S. ("L.S." or the "Student"), pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*,[1] and corresponding state laws and regulations. (ECF No. 3 ("Compl.") ¶¶ 5-6.)[2] For the following reasons, Plaintiffs' motion is

---

[1] The IDEA was amended in 2004 by the Individuals with Disabilities Education Improvement Act, Pub. L. No. 108–446, 118 Stat. 2647 (2004), but cases discussing the IDEA remain authoritative.

[2] In order not to waive any defenses, (ECF No. 28 ("D's Mem.") at 22 n.10), Defendant argues in its memorandum that there was no evidence of any violation of Section 504 of the

GRANTED IN PART and DENIED IN PART, and Defendant's motion is GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND

The following facts are based on the parties' Local Civil Rule 56.1 Statements, (ECF No. 34 ("Ps' 56.1"); ECF No. 29 ("D's 56.1")), their responsive 56.1 Statements, (ECF No. 35 ("Ps'. 56.1 Resp.");[3] ECF No. 30 ("D's 56.1 Resp.")), and the administrative record,[4] and are undisputed unless otherwise noted.

### A.    Facts

#### 1.    Preschool and the 2019-2020 IEP and School Year

L.S. resides within the confines of the Harrison Central School District.  (Ps' 56.1 ¶ 1.) On June 27, 2018, when L.S. was four years old, he was evaluated by the District's Committee on Preschool Education, which found him eligible for speech and occupational therapy services.

---

Rehabilitation Act of 1973 or Title II of the Americans with Disabilities Act, (*id.* at 22-24), even though Plaintiffs did not plead a claim under either statute in their Complaint, (*see generally* Compl.).  Because Plaintiffs have not sought relief under these statutes, the Court does not address in this Opinion Defendant's arguments or the administrative findings as to such claims.

[3] Plaintiffs also filed a Response to Defendant's 56.1 Statement at ECF No. 37, but this document is identical to the version filed at ECF No. 35.  The Court assumes ECF No. 37 was filed in error.

[4] The Office of State Review has provided the Court with the administrative decisions and the certified record of the impartial hearing, including the hearing transcripts ("Tr."), exhibits, and post-hearing briefs.  The pages of the transcripts of the hearing are numbered sequentially.  At the impartial hearing, exhibits offered by the District were identified by number, exhibits offered by the Parents were identified by letter, and exhibits entered by the Impartial Hearing Officer ("IHO") were identified by Roman numeral.  For purposes of this decision, the Parents' exhibits will be denoted by "Ps' Ex." and the District's exhibits will be denoted by "D's Ex."; the Court does not refer to exhibits entered by the IHO.  The Court uses the page numbers the parties cite in their briefs when referring to exhibits.  For Plaintiffs' exhibits, those page numbers appear on the bottom right-hand corner following the exhibit letter. For Defendant's exhibits, those page numbers appear on the bottom left-hand corner following the exhibit number.

(Ps' 56.1 ¶ 4; D's 56.1 ¶¶ 3-4.)  L.S. received speech-language therapy ("SLT") and occupational therapy ("OT") while attending private preschool.  (D's 56.1 ¶ 4.)

L.S. was to begin kindergarten in the District in the fall of 2019.  (Ps' 56.1 ¶ 6.)  On March 12, 2019, Joann Raguso, a District speech-language pathologist, performed a speech-language evaluation of L.S., which included the Clinical Evaluation of Language Fundamentals and the Goldman-Fristoe Test of Articulation.  (D's 56.1 ¶¶ 11-12, 14.)  L.S. scored in the average range based on the measures used in the Clinical Evaluation of Language Fundamentals, and Ms. Raguso reported that L.S.'s articulation was also in the average range.  (D's 56.1 ¶¶ 13, 16.)

The District's Committee on Special Education ("CSE") met on April 10, 2019 to develop an Individualized Education Program ("IEP") for L.S. for the 2019-2020 school year. (D's 56.1 ¶¶ 6, 9.)  Jennifer Toscano, the Supervisor of Elementary Special Education; Judy Goodman, the school psychologist; Margaret Hanafin, a Special Education teacher; Ms. Raguso, the speech-language pathologist; Dana DeLuca, a general education teacher; Jody Greenbaum, the District's preschool coordinator of Special Education; Barbara Paci, L.S.'s preschool teacher; Jessica Levinson, the speech-language pathologist who had worked with L.S. the previous school year; and the Parents were present.  (*Id.* ¶ 7.)

At the meeting, the CSE reviewed Ms. Raguso's speech-language evaluation.  (D's 56.1 ¶ 21.)  Ms. Raguso also reported that L.S. "has made excellent improvements with his articulation skills but still exhibits a mild articulation delay characterized by sound substitutions and the presence of developmental and non-developmental phonological processes."  (D's Ex. 66 at 2; D's 56.1 ¶ 17; Ps' 56.1 Resp. ¶ 17.)  The CSE determined that L.S. no longer required SLT, and Ms. Raguso and the Parents agreed.  (D's 56.1 ¶¶ 23-26.)   Additionally, the CSE determined

that L.S. was eligible for special education services under the classification of Other Health Impaired. (D's 56.1 ¶ 8; Ps' 56.1 ¶ 6.) Accordingly, the IEP for the 2019-2020 school year included OT to be provided in a small group twice in a six-day cycle for thirty minutes. (D's 56.1 ¶ 10; Ps' 56.1 ¶ 6.)

During the 2019-2020 school year, L.S.'s Measure of Academic Progress ("MAP") Reading Assessment scores dropped from the fifty-ninth percentile in the fall to the thirty-fourth percentile in the winter. (Ps' 56.1 ¶ 7; D's Ex. 2 at 4.) He struggled with rhyming, decoding, and segmenting words independently, and he lacked confidence. (Ps' 56.1 ¶ 7; D's Ex. 2 at 4.) By March of his kindergarten year, he was reading at a Fountas and Pinnell ("F&P") Level A, which was below grade-level expectations. (Ps' 56.1 ¶ 7; D's Ex. 2 at 4.) Nevertheless, his IEP indicated that he was "approaching grade level" in reading. (D's Ex. 2 at 4.) In math, L.S. sometimes confused two-digit numbers and reversed numbers, but his MAP Math Assessment scores remained in the sixty-third percentile from the fall to the winter. (Ps' 56.1 ¶ 7; D's Ex. 2 at 4-5.) His IEP indicated that he was performing on grade level in math. (D's Ex. 2 at 4.) In writing, L.S. struggled to form letters correctly and needed support from his teacher to encode simple consonant-vowel-consonant ("CVC") words, write a sentence, and complete writing assignments. (Ps' 56.1 ¶ 7; D's Ex. 2 at 5.) Emotionally, at the beginning of the school year, L.S. was easily overwhelmed and reluctant to perform tasks requested by the teacher, but that behavior "greatly reduced over time," and L.S. "appeared genuinely happy" by February 2020. (D's Ex. 2 at 5.) In March 2020, L.S.'s school shut down and transitioned to a remote schedule due to the COVID-19 pandemic. (D's 56.1 ¶ 28.)

### 2.    2020-2021 IEP and School Year

On March 26, 2020, the CSE convened to develop an IEP for the 2020-2021 school year. (Ps' 56.1 ¶ 7.)  The CSE proposed that L.S. receive general education and continue to receive OT two times per six-day cycle for thirty minutes.  (*Id.* ¶ 9; D's 56.1 ¶ 37.)  The IEP contained motor skills goals, but did not propose any literacy or speech goals.  (Ps' 56.1 ¶ 9; *see* D's Ex. 2 at 7.) L.S.'s classification remained Other Health Impaired.  (D's 56.1 ¶ 33.)

L.S.'s kindergarten teacher suggested that he meet with his first-grade teacher, Robyn Grossarth, during the summer of 2020, because he had had a difficult time transitioning into kindergarten.  (Tr. 158:12-16; D's 56.1 ¶ 29.)  His kindergarten teacher also asked Ms. Grossarth to tutor L.S. in reading and writing.  (Ps' 56.1 Resp. ¶ 29; Tr. 159:11-16.)  Ms. Grossarth met with L.S. once or twice a week and worked with him on reading, writing, and math.  (D's 56.1 ¶ 30; Ps' 56.1 Resp. ¶ 30; Tr. 163:6-19.)

In September 2020, the District conducted a psychological evaluation of L.S.  (Ps' 56.1 ¶ 17.)  He received a Verbal Comprehension Index score of 108, which was in the seventieth percentile; a Visual Spatial Index score of 97, which was in the forty-second percentile; a Fluid Reasoning Index score of 94, which was in the thirty-fourth percentile; a Working Memory Index score of 91, which was in the twenty-seventh percentile; a Processing Speech Index score of 100, which was in the fiftieth percentile; and a Full-Scale IQ score of 101, which was in the fifty-third percentile.  (*Id.*; D's Ex. 19 at 5.)  These scores fell in the average range.  (D's Ex. 19 at 5.)

L.S. started first grade on a hybrid schedule with students alternating in small groups for physical versus virtual attendance.  (Ps' 56.1 ¶¶ 10, 12; D's 56.1 ¶ 39.)  L.S.'s in-person cohort had eight or nine students, compared to the typical twenty students.  (Ps' 56.1 ¶ 12.)  During the

school year, Ms. Grossarth used the "Fundations" curriculum to teach reading to L.S.'s class. (*Id.* ¶ 10; Tr. 180:14-19, 595:5-596:5.)  She was able to give L.S. additional one-on-one support due to the smaller class size. (Ps' 56.1 ¶ 12; Tr. 67:7-24.)  Additionally, in November 2020, Shannon Cipolla, a certified special education teacher, worked with L.S.'s cohort to provide extra support in reading as part of a building-wide education initiative called Response to Intervention ("RTI").  (D's 56.1 ¶ 41; Ps' 56.1 Resp. ¶ 41; Tr. 379:14-23, 511:23-512:21.)  At that time, she provided "tier-one" support, in which she worked with all students in the classroom.  (Tr. 382:22-383:5.)

Around February 2021, Ms. Grossarth recognized that L.S. was making less progress than expected and required additional reading support.  (Ps' 56.1 ¶ 12; Tr. 98:10-24, 106:21-107:8, 221:20-25.)  As a result, she referred L.S. to the RTI program for additional services, and Ms. Cipolla began to provide him with "tier-two" support, in which she would target only a small group of students in the classroom.  (D's 56.1 ¶ 54; Ps' 56.1 ¶ 15; Tr. 383:2-384:10.)

Ms. Cipolla determined that L.S. had deficits in his acquisition of reading skills and would benefit from special education, which was discussed at the annual review on March 15, 2021.  (D's 56.1 ¶¶ 57-58.)  On March 24, 2021, the District revised L.S.'s IEP for the remainder of the 2020-2021 school year to add Resource Room, which is a special education program used to provide specialized reading support, and to add reading and writing goals.  (D's 56.1 ¶¶ 59, 61-62, 64.)  Counseling and a social/emotional/behavioral goal were also added to the IEP to address L.S.'s anxiety.  (*See* D's Ex. 33 at 1, 7.)  L.S. began receiving Resource Room services immediately.  (D's 56.1 ¶ 70.)  In the Resource Room, Ms. Cipolla used the Wilson Reading System ("Wilson") with L.S. and taught basic writing skills.  (D's 56.1 ¶ 68; Tr. 399:23-400:8.)

She also used F&P leveled reading books for L.S.'s reading instruction.  (Ps' 56.1 ¶ 35; Tr. 485:8-486:13.)

The parties dispute whether L.S. made progress during the school year.  (D's 56.1 ¶ 71; Ps' 56.1 Resp. ¶ 71.)  His progress report indicates that he had achieved all the goals on his IEP for the year, and Ms. Cipolla reported that L.S. made "[h]uge progress" on his reading level, as he had moved from F&P level D in February to level G in May.  (*See* D's Ex. 23; D's Ex. 38.) Nevertheless, his report card indicates that while he was meeting grade-level expectations in some areas, he had also fallen "below grade level" in other areas, including reading, by the end of the year.  (*See* D's Ex. 25 at 1, 4; Ps' 56.1 ¶ 37.)  The Parents also observed that L.S. was not decoding words, but was memorizing word lists.  (Ps' 56.1 ¶ 36; Tr. 1058:3-25.)  The parties also dispute whether and to what extent L.S.'s anxiety improved or worsened throughout the school year.  (D's 56.1 ¶ 51; Ps' 56.1 Resp. ¶ 51.)  Ms. Grossarth noted that L.S. struggled with anxiety in the beginning of the school year, which, combined with his medical issues, caused him to be absent from school, but that it improved toward the middle of the year.  (Tr. 77:9-78:6, 1043:14-1044:11; Ps' 56.1 ¶ 11; D's 56.1 ¶¶ 45-47.)

### 3.    2021-2022 CSE Meetings and IEPs

On March 15, 2021, the CSE convened to create L.S.'s IEP for the 2021-2022 school year.  (Ps' 56.1 ¶ 26; D's 56.1 ¶ 72.)  Prior to the meeting, the District conducted several evaluations of L.S.  (Ps' 56.1 ¶¶ 18-19.)  For instance, on February 10, 2021, the District conducted an OT evaluation of L.S.  (Ps' 56.1 ¶ 18.)  L.S. scored in the seventh percentile, corresponding to the low range of ability, on the motor coordination component of the Beery-Buktencia Test of Visual-Motor Integration – Sixth Edition.  (*Id.*; D's Ex. 21 at 2.)  L.S. scored in the average range on the Word Sentence Copy test.  (Ps' 56.1 ¶ 18; D's Ex. 21 at 3.)

7

On March 3, 2021, as part of the re-evaluation annual review process, Ms. Cipolla performed an educational evaluation of L.S and administered the Kaufman Test of Educational Achievement – Third Edition ("KTEA-III").  (D's 56.1 ¶ 56; Ps' 56.1 ¶ 19; D's Ex. 22.)  On the Letter and Word Recognition subtest, which is designed to assess word recognition rather than decoding ability, L.S. earned a score of 80, which was in the ninth percentile and below average range.  (Ps' 56.1 ¶ 20; D's Ex. 22 at 2.)  On the Reading Comprehension test, which is designed to measure the foundational skills required for comprehension, L.S. earned a score of 69, which was in the second percentile and the very low range of ability.  (Ps' 56.1 ¶ 20; D's Ex. 22 at 2.)  On the Math Concepts and Applications test, L.S. earned a score of 83, which was in the thirteenth percentile and below average range.  (Ps' 56.1 ¶ 21; D's Ex. 22 at 3.)  On the Math Computation test, L.S. earned a score of 87, which fell within the nineteenth percentile and below average range.  (Ps' 56.1 ¶ 21; D's Ex. 22 at 3.)  On the Written Expression test, L.S. earned a score of 71, which fell within the third percentile and the low range of ability.  (Ps' 56.1 ¶ 22; D's Ex. 22 at 3-4.)  Finally, on the Spelling test, L.S. earned a score of 81, which fell within the tenth percentile and the below average range.  (Ps' 56.1 ¶ 23; D's Ex. 22 at 4.)  Ms. Cipolla noted that L.S. displayed anxiety during the testing and that "[a]t times it was unclear whether or not the student did in fact know the answer, but did not want to write it."  (Ps' 56.1 ¶ 24; D's Ex. 22 at 1.)

Additionally, during the 2020-2021 school year, L.S. took the MAP test.  (Ps' 56.1 ¶ 27; D's Ex. 27 at 3-4.)  L.S.'s MAP Reading Assessment score dropped from the seventy-first percentile in the fall to the fifty-ninth percentile in the winter.  (Ps' 56.1 ¶ 27; D's Ex. 27 at 3.)  His MAP Math Assessment score dropped from the thirty-fourth percentile in the fall to the twenty-ninth percentile in the winter.  (Ps' 56.1 ¶ 29; D's Ex. 27 at 4.)  Nevertheless, his IEP

8

indicated that L.S. was approaching grade-level expectations in math and in written expression and mechanics.  (Ps' 56.1 ¶¶ 28-29; D's Ex. 27 at 3-4.)  Further, when developing the IEP, the CSE considered L.S.'s reading level.  (Ps' 56.1 ¶ 27; D's Ex. 27 at 3.)  L.S. began first grade reading at a F&P Level B, an early kindergarten level, and by March 2021, L.S. was reading at a level D, an end-of-kindergarten level.  (Ps' 56.1 ¶ 27; D's Ex. 27 at 3.)

The CSE ultimately developed an IEP that included OT two times per six-day cycle for thirty minutes, Resource Room in a five-to-one setting five times per six-day cycle for forty-five minutes, and individual counseling once per six-day cycle for thirty minutes.  (Ps' 56.1 ¶ 33; D's 56.1 ¶¶ 73-75.)  The IEP included two reading goals, one writing goal, two social/emotional/behavioral development goals, and three motor skills goals.  (D's 56.1 ¶ 78; Ps' 56.1 ¶ 31; D's Ex. 27 at 6-7.)  Specifically, with respect to reading, the goals stated:  "The student will use an explicitly taught strategy to decode words on his instructional level," and "The student will answer the W questions (who, what, where, when, why) after reading a text on his instructional level correctly."  (Ps' 56.1 ¶ 32; D's Ex. 27 at 6.)  With respect to writing, L.S.'s goal was to "orally rehearse his ideas with a teacher and write three sentences with proper punctuation and capitalization."  (Ps' 56.1 ¶ 32; D's Ex. 27 at 6.)

The IEP noted L.S.'s emotional challenges, including frequent requests to see the nurse for minor complaints, work avoidance, and anxiety that interfered with completing assignments.  (Ps' 56.1 ¶ 30; D's Ex. 27 at 4.)  The IEP added counseling and two social/emotional goals:  that the Student should make three positive statements about his qualities and accomplishments, and verbally identify situations where he experiences anxiety and strategies to address it.  (Ps' 56.1 ¶ 32; D's Ex. 27 at 6.)

In April 2021, the Parents signed an enrollment contract with and paid a $5,000 non-refundable deposit to the Windward School ("Windward"), a specialized educational school for cognitively capable children with language-based learning disabilities. (Ps' 56.1 ¶ 40; Ps' Ex. F.)[5] Windward groups its students into cohorts based on their learning needs and provides Orton-Gillingham programming, taught by trained special education teachers, through its Preventing Academic Failure ("PAF") program. (Ps' 56.1 ¶¶ 40-41; Tr. 921:3-923:19, 933:4-20.) On August 10, 2021, the Parents sent the District a letter stating that they felt the IEP was insufficient to meet L.S.'s needs and failed to offer him a free appropriate public education ("FAPE") in light of his lack of academic growth in the area of language arts, and that they were considering sending L.S. to Windward for the 2021-2022 school year. (Ps' 56.1 ¶ 38; D's 56.1 ¶ 79; D's Ex. 43.) In response, on August 30, 2021, the District sent the Parents a letter notifying them it would schedule a CSE meeting to review the IEP and address their concerns. (D's 56.1 Resp. ¶ 42; D's Ex. 46.) The next day, the District informed the Parents that it had scheduled the meeting for September 15, 2021. (D's 56.1 Resp. ¶ 42; D's Ex. 47.)

At the September 15 meeting, the Parents expressed concern with L.S.'s reading deficits, sharing their belief that "nothing was done" between September 2020 and March 2021 to address his needs, and arguing that forty-five minutes of Resource Room was insufficient. (D's Ex. 48 at 2.) The Parents expressed further concern that no behavioral evaluation had been conducted before L.S.'s triennial evaluation, and the Director of Special Education and Support Services, Julie Snider, responded that there was sufficient information in the record concerning L.S.'s

---

[5] The contract contained the Parents' agreement to pay the full tuition and provided that no refunds would be given, but permitted the Parents to cancel enrollment without penalty, except for forfeiture of the $5,000 deposit, up to July 1, 2021. (Ps' Ex. F at 3.)

10

behavioral needs and that the IEP sufficiently addressed them.  (*See* D's Ex. 50.)  The Parents

also questioned whether the Wilson multi-sensory program in the Resource Room was used with

fidelity, and his teacher assured them it was.  (D's Ex. 48 at 2.)  The CSE also stated that L.S.

made good progress throughout the year, and, although he had specific reading and writing

needs, he was "overwhelmingly on grade level in all other areas," according to his report card.

(*Id.*)  The CSE noted that L.S. progressed from a F&P level D in March to a level E in June.  (*Id.*

at 1; D's 56.1 ¶¶ 82-83.)[6]  Further, the CSE considered integrated co-teaching ("ICT"), but felt

that L.S. did not need such a restrictive program.  (D's Ex. 48 at 2.)[7]  The Parents dispute that the

CSE discussed ICT for L.S. at the meeting.  (*See* D's Ex. 51 at 2.)  The CSE modified L.S.'s IEP

to change his classification from Other Health Impaired to Learning Disability, (Ps' 56.1 ¶ 43;

D's 56.1 ¶ 85), and to add goals for math problem solving and spelling, (Ps' 56.1 ¶ 43; D's 56.1

¶ 86).  The Parents disagreed with the revised IEP.  (D's 56.1 ¶ 87; Ps' 56.1 ¶ 43; D's Ex. 48 at

2.)

L.S. started the second grade at Windward in September 2021.  (Ps' 56.1 ¶ 39.)

### 4.    2021-2022 School Year Performance & End-of-Year Evaluation

The District contends that after a year at Windward, L.S. had not made progress, was

exhibiting deficiencies in all academic areas, and had in fact regressed in reading.  (D's 56.1

---

[6] In May, Ms. Cipolla reported that L.S. was reading at F&P level G.  (*See* D's Ex. 38.)
It is not clear whether L.S. regressed in June to a level E, or whether the CSE or Ms. Cipolla was
mistaken as to L.S.'s reading level.

[7] An ICT classroom allows for "the provision of specially designed instruction and
academic instruction provided to a group of students with disabilities and nondisabled students."
N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(g) (2021).  These classes contain no more than
twelve students with disabilities, and at least one special education teacher and one general
education teacher.  *Id.* §§ 200.6(g)(1), (g)(2).

11

¶¶ 99-101.)  L.S.'s progress report cards from Windward demonstrate that L.S. moved from "additional practice needed" in three out of four areas of decoding in quarter one to "approaching proficiency" in two areas and "demonstrates progress" in one area of decoding in quarter four. (*See* Ps' Exs. H, Q.)  He also moved from "demonstrates progress" in the final area of decoding to "approaching proficiency."  (*See* Ps' Exs. H, Q.)  He similarly progressed in all subjects between the first and fourth quarters.  (*See* Ps' Exs. H, Q.)  Nevertheless, he remained in low percentiles in language arts and math on standardized tests taken toward the end of the school year.  (*See* D's 56.1 ¶ 103; Ps' Ex. O at 4.)  By the end of his second-grade year, L.S. was reading at a beginning-of-first-grade level under the PAF reading system.  (D's Ex. 61 at 7; D's 56.1 ¶ 102; Tr. 554:12-19.)

In April 2022, the Parents engaged Dr. Cori Scalzo, a board-certified neuropsychologist, to conduct a neuropsychological evaluation of L.S.  (Ps' 56.1 ¶ 44; *see* Tr. 682:4-5.)  The findings of Dr. Scalzo's evaluation are largely undisputed, except with respect to L.S.'s anxiety and articulation skills.  (*Compare* Ps' 56.1 ¶ 45, *with* D's 56.1 Resp. ¶ 45, *and compare* D's 56.1 ¶¶ 92-93, *with* Ps' Resp. ¶¶ 92-93.)  The District interpreted Dr. Scalzo's report as attributing L.S.'s anxiety to his inability to perform certain basic skills of daily living, because Dr. Scalzo had reported that L.S. "experienced anxiety about going to the bathroom some of which was related to his motor challenges."  (D's Ex. 55 at 5; D's 56.2 ¶ 92.)  The District also contends that the report shows that the limitations causing L.S.'s anxiety were not being addressed at Windward, (D's 56.1 Resp. ¶ 45), but the report does not explicitly state this, (*see generally* D's Ex. 55).  The Parents, on the other hand, attribute L.S.'s anxiety to his school performance, which had previously been noted in the Student's IEP.  (Ps' 56.1 ¶ 45; Ps' 56.1 Resp. ¶ 93; *see* Tr. 690:20-692:3.)

12

Dr. Scalzo administered several tests to assess L.S.'s abilities.  (Ps' 56.1 ¶¶ 46-47.)  As a measure of overall intellectual ability, Dr. Scalzo used the Wechsler Intelligence Scale for Children – Fifth Edition ("WISC-V").  (*Id.*; D's Ex. 55 at 6.)  L.S. achieved a full-scale IQ score of 104, corresponding to the sixty-first percentile and falling within the average range.  (Ps' 56.1 ¶ 46.)  L.S. also scored in the ninety-second percentile, corresponding to the superior range, on the Verbal Comprehension Index.  (*Id.*; D's Ex. 55 at 6-7.)  In the absence of dyslexia, a student with similar scores would be a strong learner in the classroom.  (Ps' 56.1 ¶ 46; Tr. 707:14-708:7.)

To assess L.S.'s academic skills, Dr. Scalzo again administered several tests.  (Ps' 56.1 ¶ 47.)  On the Woodcock Johnson Tests of Achievement – Fourth Edition ("WJ-IV"), used to assess reading and decoding skills, L.S. read single words at the fifth percentile, and guessed unfamiliar words based on initial sounds rather than using decoding strategies.  (*Id.* ¶ 48; D's Ex. 55 at 8.)  His ability to decode nonsense words was at the fifteenth percentile on this test, and was at the tenth percentile on the Feifer Assessment of Reading ("FAR") test.  (D's Ex. 55 at 8; Ps' 56.1 ¶ 48.)  On the FAR, L.S. scored in the third percentile with respect to his ability to quickly read regular words, and in the fifth percentile with respect to his ability to quickly read irregular words.  (D's Ex. 55 at 8; Ps' 56.1 ¶ 48.)  On the FAR's Phonological Awareness test, L.S. scored in the tenth percentile.  (D's Ex. 55 at 8; Ps' 56.1 ¶ 49.)  He scored in the twenty-seventh percentile on the Rapid Naming subtest.  (D's Ex. 55 at 8; Ps' 56.1 ¶ 49.)  L.S. also had low scores when it came to reading in context.  (Ps' 56.1 ¶ 50.)  He scored in the third percentile on the FAR's Oral Reading Fluency test, and in the ninth percentile, below first grade level, on the Gray Oral Reading Tests – Fifth Edition ("GORT-5") subtest.  (*Id.*; D's Ex. 55 at 8.)  On the GORT-5's reading comprehension test, L.S. scored in the sixteenth percentile, but his score

13

dropped to the fourth percentile with less context on the WJ-IV.  (Ps' 56.1 ¶ 50; D's Ex. 55 at 8.)

L.S. scored in the twelfth percentile with respect to his ability to write letters and spell single

words.  (Ps' 56.1 ¶ 51; D's Ex. 55 at 8.)  He struggled with handwriting and letter formation, and

exhibited frequent letter reversals.  (Ps' 56.1 ¶ 51; D's Ex. 55 at 8.)  His ability to write single

sentences in response to examiner prompts, however, was in the average range in the forty-fourth

percentile.  (Ps' 56.1 ¶ 51; D's Ex. 55 at 8.)  Finally, on the tests assessing math skills including

math problems in numeric format, math reasoning, and retrieval of math facts, L.S. scored in the

thirtieth, nineteenth, and thirtieth percentiles, respectively.  (Ps' 56.1 ¶ 52; D's Ex. 55 at 9.)

L.S. had a stronger performance on the Clinical Evaluation of Language Fundamentals

subtests.  (Ps' 56.1 ¶ 53; D's Ex. 55 at 9.)  He scored in the sixty-third percentile for sentence

comprehension, sixty-third percentile for linguistic concepts, seventy-fifth percentile for word

structure, thirty-seventh percentile for word classes, and the ninety-eighth percentile for recalling

sentences.  (D's Ex 55 at 20; *see* Ps' 56.1 ¶ 53.)  Despite these gains, Dr. Scalzo's report noted

that L.S. "demonstrated language processing weaknesses in the areas that underlie reading

decoding and spelling, phonological processing, and retrieval.  He also continued to demonstrate

significant difficulties with speech articulation."  (Ps' 56.1 ¶ 54; D's Ex. 55 at 9.)  Additionally,

on the NEPSY-II test, which evaluates visual/motor ability, L.S. displayed significant

weaknesses in fine motor, oral motor and visual motor functioning.  (Ps' 56.1 ¶ 55; D's Ex. 55 at

12.)

Finally, with respect to L.S.'s attention and executive functioning abilities, Dr. Scalzo

reported that L.S. presented with significant deficits in the areas of working memory, auditory

attention and visual attention.  (D's Ex. 55 at 10.)  Dr. Scalzo noted that L.S.'s distractibility and

impulsivity typically had been attributed to his anxiety, but might be related to a separate

difficulty with attention and self-regulation.  (*Id.*)  Dr. Scalzo also noted that it was possible that feeling distracted, restless and fatigued may lead L.S. to notice outside noises and require breaks to address physical concerns.  (*Id.* at 11.)  Dr. Scalzo did not diagnose L.S. with Attention Deficit Hyperactivity Disorder because his parent and teacher reports were not clinically significant, but said his symptoms would need to be monitored.  (*Id.*; Ps' 56.1 ¶ 56; D's 56.1 Resp. ¶ 56; D's Ex. 55 at 11.)

Based on her findings, Dr. Scalzo diagnosed L.S. with specific learning disorders in reading and written expression, generalized anxiety disorder, developmental coordination disorder and speech-sound disorder.  (Ps' 56.1 ¶ 57; D's Ex. 55 at 14.)  Dr. Scalzo reported that L.S.'s deficits in language-processing underlie his language-based learning disabilities.  (Ps' 56.1 ¶ 58; D's Ex. 55 at 13.)  To address these deficits, Dr. Scalzo recommended that L.S. continue to receive education specialized for treating his specific learning disorders in reading (dyslexia) and writing, and continued, intensive remediation.  (D's Ex. 55 at 13-14; Ps' 56.1 ¶ 60.)  Dr. Scalzo also noted that the consistency, intensity, and fidelity to the program of intervention at Windward – consisting of multi-sensory, phonics-based, systematic instruction in reading and writing – was critical to his progress.  (D's Ex. 55 at 14; Ps' 56.1 ¶ 59.)  Dr. Scalzo further opined that specialized instruction in the area of executive functioning was also critical to L.S.'s success, and that he requires special education instruction to help him mitigate the challenges created by symptoms of inattention, restlessness, and poor planning and organization.  (D's Ex. 55 at 15; Ps' 56.1 ¶ 61.)  Additionally, Dr. Scalzo recommended SLT to remediate his speech articulation and OT to address his fine motor deficits.  (Ps' 56.1 ¶ 62; D's Ex. 55 at 15-16.)  She recommended that L.S. continue therapy to treat his symptoms of anxiety, and recommended a Cognitive Behavioral Therapy approach.  (Ps' 56.1 ¶ 63; D's Ex. 55 at 16.)  Finally, Dr. Scalzo's

report concluded that L.S. was correctly placed at Windward given his specific profile, noting that he was making slow but deliberate progress there.  (Ps' 56.1 ¶ 70; D's Ex. 55 at 14.)

       **5.**       **2022-2023 School Year CSE Meeting & IEP**

On May 27, 2022, the CSE convened to develop L.S.'s IEP for the 2022-2023 school year.  (Ps' 56.1 ¶ 64.)  The Parents shared Dr. Scalzo's report with the CSE ahead of the annual review, and the CSE reviewed the report at the meeting.  (D's 56.1 Resp. ¶ 44; D's 56.1 ¶ 91; D's Ex. 61 at 1.)  Dr. Scalzo was also present at the meeting, along with a Windward representative.  (Ps' 56.1 ¶ 64; D's Ex. 61 at 1.)  The Windward representative reported that at Windward L.S. was in a class of six students for reading, was able to apply explicitly taught strategies to decode CVC words, and with teacher support could decode words with suffixes.  (Ps' 56.1 ¶ 64; D's Ex. 61 at 7.)   She also noted that he had a good grasp of addition but was struggling with subtraction, and needed extra help with word problems.  (Ps' Ex. N at 20:53-21:56.)  She added that L.S. was comfortable and indeed thriving in the structure at Windward and enjoyed positive social interactions.  (*Id.* at 24:55-25:20.)

The CSE recommended ICT for four hours per day, along with OT two times per six-day cycle for thirty minutes and counseling services once per six-day cycle for thirty minutes.  (Ps' 56.1 ¶ 65; D's Ex. 61 at 1.)  The CSE felt that L.S. required more support than Resource Room, but that a special class program would be too restrictive for him at that time.  (D's Ex. 61 at 2.)  The Windward representative disagreed with the recommendation for ICT, arguing that L.S. needed a small class environment and was not ready to participate in a mainstream environment.  (*Id.*; Ps' 56.1 ¶ 67.)  Dr. Scalzo agreed, stating that L.S. required a small class setting given his anxiety and the need for specialized instruction.  (D's Ex. 61 at 2; Ps' 56.1 ¶ 67.)

16

The CSE proposed four reading goals for L.S.'s IEP: that the Student will read a list of ten irregular words with accuracy; read an instructional text orally with accuracy, appropriate rate, and expression at eighty words per minute with ninety-five percent accuracy; answer three inferential comprehension questions accurately after reading a text on his instructional level; and utilize a decoding strategy to read ten words with digraphs, blends and suffixes accurately. (Ps' 56.1 ¶ 68; D's Ex. 61 at 10.) Two writing goals were proposed: that the Student will write three to five sentences with proper capitalization, punctuation, and spelling, and that the Student will demonstrate command of the conventions of standard English spelling by spelling ten words with consonant blends, digraphs and common vowel patterns. (Ps' 56.1 ¶ 68; D's Ex. 61 at 10-11.) As for math, the CSE proposed two goals: that the Student will demonstrate knowledge of regrouping with addition and subtraction by solving five regrouping problems correctly, and the Student will solve one step addition and subtraction story problems. (Ps' 56.1 ¶ 68; D's Ex. 61 at 11.) The CSE proposed one social/emotional/behavioral goal: that the Student will verbally identify situations where he experiences anxiety and identify strategies to deal with his anxiety. (Ps' 56.1 ¶ 68; D's Ex. 61 at 11.) Finally, the CSE proposed four motor skills goals, focused on improving L.S.'s visual spatial skills, visual scanning and attention shifting, fine motor precision and typing. (D's Ex. 61 at 11.)

The CSE also discussed L.S.'s speech at the meeting. (*See* D's Ex. 61 at 2.) L.S.'s mother shared that L.S. had recently been seen by a specialist who found that he had a tongue tie contributing to his articulation issues, and that they would share the report with the District once it became available. (*Id.*; Ps' 56.1 ¶ 66.) The CSE recommended that a speech and language evaluation be completed after a course of action regarding the tongue tie had been determined by L.S.'s doctors. (Ps' 56.1 ¶ 66; D's Ex. 61 at 2.)

17

Dr. Wilder, who performed a private speech evaluation on May 26, 2022, (*see* Ps' Ex. M), diagnosed L.S. with "a moderate oral-motor/speech disorder secondary to physiological dysfunction of the oral mechanism," (*id.* at 3; D's 56.1 ¶¶ 115-16).  She recommended oral-motor therapy to focus on improving tone, strength, grading and dissociation of tongue, lip and jaw movements to achieve standard articulation.  (Ps' Ex. M at 3.)  She noted that a different doctor, Dr. Jill Meyer, wanted to start expansion therapy on L.S.'s palate before starting oral-motor therapy.  (*Id.*)  At the end of her evaluation, she set out a program plan with exercises for L.S. to perform, (*id.* at 5-8), and in July, she recommended that he receive oral-motor therapy two times per week and implement the program plan with a trained therapist, (*id.* at 9).

On June 14, 2022, the Parents notified the District that they intended to place L.S. at Windward for the 2022-2023 school year because the District had denied him a FAPE.  (Ps' 56.1 ¶ 71; D's Ex. 62.)  The Parents had signed a contract and paid a $5,000 non-refundable deposit with Windward for the 2022-2023 school year on February 8, 2022.  (Ps' Ex. L.)[8]  The District contends that the Parents also paid non-refundable tuition in the amount of $31,787.50 to Windward by May 15, 2022, (D's 56.1 Resp. ¶ 71), but that is not supported by the record, (*see* Ps' Ex. T).  The Parents did not make a further payment to Windward until July 15, 2022.  (*Id.*)  In September 2022, L.S. began third grade at Windward.  (Ps' 56.1 ¶ 72.)

### 6.    2022-2023 School Year Performance & Evaluations

On September 22, 2022, at the beginning of the school year, Ms. Raguso performed a speech re-evaluation of L.S.  (D's 56.1 ¶ 118; Ps' Ex. R.)  L.S. performed in the average range or above average range in all areas except for articulation, in which he performed in the below

---

[8] The contract again contained the Parents' agreement to pay the full tuition and provided that no refunds would be given, but permitted the Parents to cancel enrollment without penalty, except for forfeiture of the $5,000 deposit, up to July 1, 2022.  (Ps' Ex. L at 1.)

average range.  (D's 56.1 ¶ 119; Ps' Ex. R at 6.)  Ms. Raguso noted that he presented with a high narrow palatal arch and a tongue tie that limited tongue tip elevation.  (Ps' Ex. R at 6; *see* D's 56.1 ¶ 120.)

L.S.'s progress reports from Windward show that L.S. progressed from "approaching proficiency" or "demonstrates progress" to "proficient" in many areas of language arts throughout the year.  (*Compare* Ps' Ex. U at 1-2, *with* Ps' Ex. SS at 1-2.)  He made similar progress in the other subjects as well.  (*Compare* Ps' Ex. U, *with* Ps' Ex. SS.)  L.S. also significantly improved in standardized testing compared to the end of the 2021-2022 school year.  (*See* Ps' Ex. NN at 4.)  In language arts, L.S. improved from the fifth percentile to the fifty-third percentile in vocabulary, and from the seventh percentile to the forty-fourth percentile in reading.  (*Id.*)  In math, L.S. improved from the twenty-fourth percentile to the seventy-first percentile in computation, and from the fourteenth percentile to the fortieth percentile in mathematics.  (*Id.*)

Dr. Scalzo re-evaluated L.S. at the end of his third-grade year in June 2023.  (Ps' 56.1 ¶ 73.)  Dr. Scalzo noted that L.S. had been working with a speech therapist on articulation and, although his speech had improved, articulation errors persisted.  (*Id.*; Ps' Ex. LL at 1.)  She also re-administered subtests of the FAR and WJ-IV.  (Ps' 56.1 ¶ 74; Ps' Ex. LL at 2.)  L.S.'s scores improved on all subtests since his testing in 2022.  (Ps' 56.1 ¶ 74.)  His ability to read single words improved from the fifth percentile to the twenty-seventh percentile, which corresponded to a 2.8 grade level.  (*Id.* ¶ 75.)  His ability to quickly read regular words on the FAR improved from the third percentile to the twenty-fifth percentile, and his ability to quickly read irregular words improved from the fifth percentile to the thirtieth percentile.  (*Id.*; Ps' Ex. LL at 2-3.)  His score on the Oral Reading Fluency subtest of the FAR also increased from the third percentile to the thirtieth percentile.  (Ps' 56.1 ¶ 75; Ps' Ex. LL at 2-3.)

19

L.S. also improved in decoding. (Ps' 56.1 ¶ 76.) His ability to decode nonsense words improved from the fifteenth percentile to the fiftieth percentile, corresponding to the fourth-grade level. (*Id.*; Ps' Ex. LL at 2.) On the FAR, his nonsense word decoding improved from the tenth percentile to the thirteenth percentile. (Ps' 56.1 ¶ 76; Ps' Ex. LL at 2.) This smaller increase was likely because L.S. had not yet covered at Windward the rules for many of the multi-syllable words presented on the FAR. (Ps' 56.1 ¶ 76; Ps' Ex. LL at 2.) L.S.'s spelling also moved from the twelfth percentile to the twenty-ninth percentile, corresponding to a third-grade level. (Ps' 56.1 ¶ 77; Ps' Ex. LL at 2-3.) His ability to write single sentences in response to examiner prompts increased from the forty-fourth percentile to the sixty-fifth percentile, placing L.S.'s ability at the 5.2 grade level. (Ps' 56.1 ¶ 77; Ps' Ex. LL at 2-3.) His handwriting had also improved in formation, sizing and spacing compared to previous testing. (Ps' 56.1 ¶ 77; Ps' Ex. LL at 2.) Nevertheless, L.S. had some persistent errors, including "mis-represent[ing] and mis-sequenc[ing] sounds in unfamiliar words when reading and spelling." (Ps' Ex. LL at 2.)

Overall, Dr. Scalzo concluded that L.S. was "responding well to intervention and in the predicted pattern as he covers the phonological code through systematic instruction and as that code becomes more automatic." (Ps' 56.1 ¶ 78; Ps' Ex. LL at 2.) She recommended that he "continue to systematically reinforce the code he has learned," and that he "remain at Windward where he can receive intensive, systematic, phonics-based instruction to continue to remediate his Specific Learning Disorders in Reading and Written Expression." (Ps' 56.1 ¶ 78; Ps' Ex. LL at 2.)

### B.    Procedural History

#### 1.    Due Process Complaint and IHO Decision

On January 5, 2023, Plaintiffs filed a Due Process Complaint ("DPC"), alleging that the District failed to offer L.S. a FAPE for the 2020-2021, 2021-2022, and 2022-2023 school years. (Ps' 56.1 ¶ 79.)  Specifically, Plaintiffs alleged that the District failed to provide a FAPE by:  (1) failing to adequately evaluate L.S.; (2) failing to offer strategies based on peer-reviewed research; (3) failing to develop a legally appropriate IEP due to lack of an appropriate Functional Behavior Assessment ("FBA") and resultant Behavior Intervention Plan ("BIP"); (4) failing to offer appropriate goals or related services; (5) failing to consider the full continuum of services; (6) failing to follow procedural requirements; (7) failing to provide the Parents with meaningful participation in the development of the IEP; and (8) failing to provide adequate supports.  (*See* Ps' Ex. A at 8-10.)  Plaintiffs also argued Windward was appropriate for L.S. and sought tuition reimbursement for the 2021-2022 and 2022-2023 school years.[9]  (*See id.* at 10-12; Ps' 56.1 ¶ 80.)

The DPC was heard before IHO Linda Agoston, who conducted the hearing across eight dates between April 17, 2023 and November 1, 2023.  (Ps' 56.1 ¶ 81.)  At the hearing, Dr. Lydia Soifer, an expert in language development, language disorders and literacy, testified for Plaintiffs, (*see* Findings of Fact and Decision of IHO Linda Agoston, dated Jan. 22, 2024 ("IHO Decision") at 3; Tr. 844-1012), along with Dr. Scalzo, (*see* IHO Decision at 3; Tr. 678-832), and L.S.'s mother (*see* IHO Decision at 2-4; Tr. 1024-1134.)  The following individuals testified for

---

[9] Plaintiffs also argued that L.S. did not make meaningful progress during the 2019-2020 school year and sought compensatory education services for the 2020-2021 school year, (Ps' 56.1 ¶¶ 79-80), but neither of these school years is at issue in this case.  Accordingly, I focus my review on the IHO's decision related to the 2021-2022 and 2022-2023 school years.

21

the District:  Ms. Toscano, Ms. Grossarth, Emily Rudolph (L.S.'s OT provider), Ms. Cipolla and

Ms. Raguso.  (*See* IHO Decision at 2-4.)

The IHO issued a sixty-one page, single-spaced decision, in which she held that the

District denied L.S. a FAPE for the 2020-2021, 2021-2022, and 2022-2023 school years.  (Ps'

56.1 ¶ 82; IHO Decision.)  Specifically, with respect to the 2021-2022 school year, the IHO

found that (1) the District failed to evaluate the Student in all areas of his disability; the

Educational Evaluation was not completed in a timely manner; the District failed to conduct a

behavior evaluation despite the Student's behavior issues; and the IEP did not address the

Student's anxiety and reading, writing, and math challenges, (IHO Decision at 38-40); (2) the

lack of multi-sensory, phonics-based instruction was a denial of a FAPE because "the record was

replete with evidence" that the Student needed such instruction to progress, and that the Student

was inappropriately grouped in the Resource Room, (*id.* at 40-42); (3) the Student was denied a

FAPE because the IEP's goals were not appropriate to address the Student's needs in the absence

of goals in the areas of articulation, oral motor skills, and decoding, (*id.* at 42-43); (4) the IEP did

not offer services that the Student required, including SLT, which denied him a FAPE, (*id.* at

43); (5) the District failed to consider the amount of regression during a break in instruction and

thus failed to consider an extended school year ("ESY") – *i.e.*, summer teaching, (*id.* at 45); and

(6) all of these issues significantly impeded the Parents' opportunity to participate in the

decision-making process and denied the Student a FAPE, (*id.* at 44).

With respect to the 2022-2023 school year, the IHO found (1) the lack of CSE

evaluations to support the CSE's decision not to provide full-time, multi-sensory instruction

impeded the Parents' opportunity to participate in the decision-making process, (*id.* at 49); (2)

the academic goals were inappropriate and significantly impeded the Parents' opportunity to

participate in the decision-making process, (*id.*); (3) the lack of phonics-based instruction was a denial of a FAPE, and the evidence did not establish that the Student would be appropriately grouped in the ICT class, (*id.* at 50); (4) the Parents' participation was impeded by the lack of adequate evaluations and the CSE's failure to consider the Parents' objection to the ICT class, (*id.* at 50-51); and (5) the ICT recommendation was pre-determined, (*id.* at 51).

Further, with respect to both school years, the IHO determined that Windward met L.S.'s academic, social, and emotional needs as recommended by Dr. Scalzo. (*Id.* at 45-48, 51-53; Ps' 56.1 ¶ 83.) The IHO found specifically that Windward addressed L.S.'s low self-esteem through the utilization of small classes and specialized programs. (IHO Decision at 46-47, 51-52; Ps' 56.1 ¶ 83.) Finally, the IHO found that the equities favored the Parents. (IHO Decision at 47-48, 52-53; Ps' 56.1 ¶ 84.)

Accordingly, the IHO ordered the District to reimburse Plaintiffs for the costs of L.S.'s tuition at Windward for the 2021-2022 and 2022-2023 school years. (Ps' 56.1 ¶ 85.)

### 2.    The District's Appeal and the State Review Officer Decision

The District appealed the IHO's decision to the New York State Education Department's Office of State Review, contending that, with respect to the 2021-2022 school year, the IHO incorrectly found that: (1) the District failed to consider an ESY, thereby impeding the Parents' opportunity to participate in the decision-making process; (2) the District was required to conduct an FBA and design a BIP and that the failure to do so impeded the Parents' ability to participate in the decision-making process; (3) the District failed to comprehensively evaluate L.S. in all areas of suspected disability, impeding the Parents' opportunity to participate in the decision-making process and denying L.S. a FAPE; (4) the District failed to develop an appropriate IEP to address L.S.'s reading, writing and anxiety; (5) the lack of multi-sensory,

23

phonics-based instruction was a denial of a FAPE; (6) the Student was inappropriately grouped in the Resource Room; (7) the program and related services were insufficient to address the Student's academic, social, and emotional difficulties; (8) the Student required SLT and related goals to address his articulation; (9) the District's decision not to change the Student's program from general education to special education exacerbated the Student's anxiety; (10) the District did not establish that a FAPE was offered to the Student; (11) Windward was appropriate for the Student; and (12) equitable considerations favored the Parents' claim for reimbursement.  (*See* Verified Request for Review, IHO Case No. 594729 ("D's Appeal") at 1-7.)[10]

The District also argued that, with respect to the 2022-2023 school year, the IHO incorrectly found that:  (1) the District failed to consider an ESY, thereby impeding the Parents' opportunity to participate in the decision-making process; (2) the lack of CSE evaluations resulted in inappropriate goals and impeded the Parents' opportunity to participate in the decision-making process; (3) the academic goals for the Student were inappropriate and significantly impeded the Parents' opportunity to participate in the decision-making process; (4) there was no discussion of the PAF methodology or reading program, and the lack of multi-sensory, phonics-based instruction was a denial of a FAPE; (5) the Student would not be grouped appropriately in the ICT class; (6) the District was required to and declined to consider placing the Student at Windward; (7) procedural inadequacies in the Student's IEP impeded the Parents' participation in the decision-making process; (8) inadequate evaluations for the development of IEP goals resulted in inappropriate goals which significantly impeded the Parents' opportunity to participate in the decision-making process; (9) the CSE did not consider the Parents'

---

[10] The District also argued that the IHO made several erroneous findings relating to the 2020-2021 school year.  (*See generally* D's Appeal.)  Because that school year is not at issue in this case, those arguments have been omitted here.

disagreement with the ICT recommendation and pre-determined the recommendation; (10) the District did not establish that a FAPE was offered to the Student; (11) Windward was an appropriate placement for the Student; and (12) equitable considerations favored the Parents' claim for reimbursement.  (*See* D's Appeal at 2, 7-10.)

Plaintiffs responded by submitting a Verified Answer, in which they argued that the IHO's decision was correct as to her findings of fact and conclusions of law establishing that the District denied L.S. a FAPE for the 2021-2022 and 2022-2023 school years, and requested that the State Review Officer ("SRO") dismiss the District's appeal and affirm the IHO's decision. (*See* Verified Answer, IHO Case No. 594729 at 1, 9.)

On April 25, 2024, the SRO issued a forty-two page, single-spaced decision reversing the IHO's finding that the District failed to provide L.S. with a FAPE during the 2021-2022 school year, affirming the IHO's finding that the District failed to provide L.S. with a FAPE for the 2022-2023 school year, and reversing the IHO's finding that Windward was an appropriate placement for the 2022-2023 school year.  (Ps' 56.1 ¶ 87; *see generally* Decision of a State Review Officer No. 24-071, dated Apr. 25, 2024 ("SRO Decision").)

With respect to the 2021-2022 school year, the SRO found the IHO's criticism of the District's reevaluation in March 2021 unwarranted because the District used a variety of assessment tools and strategies in the evaluation as required.  (SRO Decision at 14-15.)  Further, the SRO determined that the IHO erred in finding that the District did not have sufficient information to recommend appropriate services including SLT, because the evaluative information at the time of the March 2021 CSE did not indicate that the Student required such therapy.  (*See id.* at 15 n.17.)  The SRO also determined the IHO erred in concluding that the failure to conduct an FBA amounted to a denial of a FAPE, as the CSE adequately identified the

Student's behaviors in the March 2021 IEP relating to his anxiety and work avoidance and addressed these needs by adding counseling and social/emotional goals. (*Id.* at 19.)

Next, the SRO determined that the evidence did not demonstrate that the Student required a specific reading methodology to the exclusion of all others in order to receive a FAPE. (*Id.* at 25.) Further, the SRO found that the IHO erred in relying on expert testimony to conclude that the teaching methodology selected for the Student during the 2021-2022 school year was inappropriate, because the expert testimony and the expert's evaluations of the Student were not before the March 2021 CSE. (*Id.* at 24-25.)

The SRO determined that the March 2021 IEP's goals targeted the Student's areas of need, and any shortcomings in drafting the goals did not render the IEP so deficient as to amount to a denial of a FAPE. (*Id.* at 27.) The SRO found that the IHO did not use the proper standard for evaluating whether a student requires twelve-month services and erred in finding that the failure to consider an ESY contributed to a denial of a FAPE. (*Id.*) Finally, the SRO concluded that the hearing record did not support the IHO's finding that the Parents were denied meaningful participation because of the alleged inadequacy of evaluation information. (*Id.* at 28.)

Because the SRO determined the District offered the Student a FAPE for the 2021-2022 school year, he did not reach the issue of whether Windward was an appropriate unilateral placement or whether the equities favored the Parents, and he rescinded the IHO's award for reimbursement for that school year. (*Id.* at 41.)

With respect to the 2022-2023 school year, the SRO disagreed with the reasoning underlying several of the IHO's findings but nevertheless concluded that the District did not offer the Student a FAPE. (*Id.* at 29.) Specifically, the SRO found that the failure to offer

speech-language services was a denial of a FAPE, as the May 2022 CSE had an evaluation report prepared by a neuropsychologist from April 2022 that recommended SLT.  (*Id.* at 34-37.)  He noted that the CSE had decided to wait for more information from the Parents regarding the Student's tongue tie before conducting a speech-language evaluation, but concluded that the record showed a need for SLT for phonological processing difficulties unrelated to L.S.'s articulation issues.  (*Id.* at 36.)

But the SRO reversed the IHO's finding that Windward was an appropriate unilateral placement.  (*Id.* at 41; Ps' 56.1 ¶ 87.)  The SRO found that the Parents did not provide sufficient evidence on this point, because no one from Windward testified at the hearing and the Plaintiffs' expert witness did not speak to the Student's teachers or observe him at Windward, and thus her testimony was neither weighty nor convincing.  (SRO Decision at 39-41.)  Because the SRO determined that the unilateral placement of the Student at Windward was not appropriate, he did not reach the issue of whether equitable considerations weighed in favor of the Parents' request for reimbursement.  (*Id.* at 41.)  The SRO entered an order denying reimbursement to Plaintiffs for the costs associated with L.S.'s placement at Windward for the 2022-2023 school year.  (*Id.* at 42; *see* Ps' 56.1 ¶ 87.)

### 3.    The Instant Action

Plaintiffs filed their Complaint on August 23, 2024.  (*See* Compl.)  The Complaint seeks a judgment in Plaintiffs' favor (1) reversing the SRO's April 25, 2024 finding and decision; (2) determining The Windward School was an appropriate unilateral placement for the 2021-2022 and 2022-2023 school years; (3) determining Defendant is required to reimburse Plaintiffs for tuition and costs associated with the unilateral placement of L.S. for those school years; and (4)

ordering Defendant to pay Plaintiffs' reasonable attorneys' fees and costs in accordance with 20

U.S.C. § 1415(i)(3)(B).  (*Id.* at 8.)

## II.    LEGAL STANDARDS

### A.    Summary Judgment Standard for IDEA

Motions for summary judgment customarily resolve IDEA actions in federal court.  *See*

*Antonaccio ex rel. Alex v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F. Supp. 2d 710, 714

(S.D.N.Y. 2003).  Under the IDEA, unlike in the usual case, the existence of a disputed issue of

fact will not defeat the motion.  *See id.*  Rather, summary judgment "is a pragmatic procedural

mechanism for reviewing administrative decisions."  *T.P. ex rel. S.P. v. Mamaroneck Union Free*

*Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009).[11]  In reviewing an action pursuant to 20 U.S.C.

§ 1415(i), the district court "(i) shall receive the records of the administrative proceedings; (ii)

shall hear additional evidence at the request of a party; and (iii) basing its decision on the

preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20

U.S.C. § 1415(i)(2)(C); *see P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 406 (S.D.N.Y.

2017).

The court's review "requires a more critical appraisal of the agency determination than

clear-error review but falls well short of complete *de novo* review."  *L.O. ex rel. K.T. v. N.Y. City*

*Dep't of Educ.*, 822 F.3d 95, 108 (2d Cir. 2016).  The district court must engage in an

independent review of the administrative record and make a determination based on a

preponderance of the evidence, but its review of state administrative decisions is limited.  *See*

*Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982); *M.H. ex rel. P.H. v. N.Y.C. Dep't of Educ.*,

---

[11] Unless otherwise indicated, case quotations omit internal citations, quotation marks, footnotes and alterations.

685 F.3d 217, 240 (2d Cir. 2012); *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998).  "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  *Walczak*, 142 F.3d at 129; *see M.H.*, 685 F.3d at 240.

In many instances, "the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court," but the determination "must also be colored by an acute awareness of institutional competence and role."  *M.H.*, 685 F.3d at 244.  Deference to administrative decisions is particularly warranted where the district court's review "is based entirely on the same evidence as that before the SRO," *id.*, and where the IHO and SRO decisions are in agreement, *C.W. ex rel. W.W. v. City Sch. Dist.*, 171 F. Supp. 3d 126, 131-32 (S.D.N.Y. 2016).  Where the IHO and SRO decisions conflict, the IHO's "may be afforded diminished weight," as the Court "defer[s] to the final decision of the state authorities" – that is, the SRO's decision.  *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009).  Reviewing courts should also be mindful that they are not to "substitute their own notions of sound educational policy for those of the school authorities which they review."  *Rowley*, 458 U.S. at 206.  Accordingly, "a court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned," *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012), particularly with respect to "determinations regarding the substantive adequacy of an IEP," *M.H.*, 685 F.3d at 244.  In short, deference to "the application of expertise and the exercise

29

of judgment by school authorities" is appropriate where they "offer a cogent and responsive explanation for their decisions."  *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 404 (2017).

### B.      Provision of a FAPE and Unilateral Placement in Private Schools

"States receiving federal funds under the IDEA must provide disabled children with a FAPE," *Ferreira v. Aviles-Ramos*, 120 F.4th 323, 329 (2d Cir. 2024), which "consists of special education and related services tailored to meet the unique needs of a particular child," *Cruz v. Banks*, 134 F.4th 687, 691 (2d Cir. 2025), *certified question accepted*, 43 N.Y.3d 983 (2025). Related services include "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education."  20 U.S.C. § 1401(26)(A).

"The IEP is 'the centerpiece of the [IDEA's] education delivery system for disabled children.'"  *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 741 (2d Cir. 2018) (quoting *Endrew F.*, 580 U.S. at 391).  The IEP must be developed annually by "a school official qualified in special education, the child's teacher, the parents or guardian, and, where appropriate, the child."  *Archibald v. Banks*, No. 24-CV-5919, 2025 WL 2592263, at *1 (S.D.N.Y. Sept. 8, 2025), *appeal filed*, No. 25-2330 (2d Cir. Sept. 26, 2025); *see Walczak*, 142 F.3d at 122.  "A school district meets its obligations to provide a FAPE by creating an IEP that is developed in compliance with the IDEA's procedural and substantive requirements."  *N.B. v. N.Y.C. Dep't of Educ.*, 711 F. App'x 29, 32 (2d Cir. 2017) (summary order).  In the Second Circuit, review of the adequacy of an IEP proceeds in two steps:  (1) "whether the state has complied with the procedures set forth in the IDEA" and (2) "whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits."

*Killoran v. Westhampton Beach UFSD*, No. 21-2647, 2023 WL 4503151, at *2 (2d Cir. July 13, 2023) (summary order).  "As to this latter requirement, the IEP need not bring the child to grade-level achievement, but it must aspire to provide more than *de minimis* educational progress." *N.B.*, 711 F. App'x at 32; *see M.B. v. Katonah-Lewisboro Union Free Sch. Dist.*, No. 24-CV-1745, 2025 WL 2773358, at *8 (S.D.N.Y. Sept. 25, 2025) ("[A]n IEP providing merely more than *de minimis* progress from year to year is insufficient").  The education program must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 403.  But the statute guarantees only an appropriate education; an IEP need not "provide everything that might be thought desirable by loving parents." *M.B.*, 2025 WL 2773358, at *8.

"In addition to providing an education that is likely to produce progress and tailored to the unique needs of the child, the program must be offered in the least restrictive environment," *N.K.M. ex rel. G.M. v. Rye City Sch. Dist.*, No. 23-CV-1109, 2024 WL 4803941, at *12 (S.D.N.Y. Nov. 15, 2024), known as the "LRE."  "[A] disabled student's least restrictive environment refers to the least restrictive educational setting consistent with that student's needs, not the least restrictive setting that the school district chooses to make available." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 163 (2d Cir. 2014).  "This requirement expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers." *Id.* at 161; *see* 34 C.F.R. § 300.116 (2006) ("Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled.").  To determine whether a student's placement is the LRE, courts consider "(1) whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child,

31

and (2) if not, then whether the school has mainstreamed the child to the maximum extent appropriate." *Killoran*, 2023 WL 4503151, at *3.

"New York's regulations implementing the goals of the IDEA 'appear to track the IDEA closely.'" *P.C.*, 232 F. Supp. 3d at 408 (quoting *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363 (2d Cir. 2006)); *see* N.Y. Educ. Law §§ 4401 to 4410-b. Parents are entitled to challenge "any matter relating to the identification, evaluation or educational placement of the student or the provision of a free appropriate public education to the student." N.Y. Educ. Law § 4404(1); *see also* 20 U.S.C. § 1415(b)(6)(A) (same). Such challenges must be heard at an impartial due process hearing conducted by the state or local education agency, *see* 20 U.S.C. § 1415(f), and either party may appeal an adverse decision to the appropriate state agency, *see id.* § 1415(g); N.Y. Educ. Law § 4404(2). Once this administrative process is exhausted, a party may file a civil action in federal or state court challenging the administrative decision. *See* 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

"If a parent believes the state has failed to provide their child with a FAPE, they may choose to enroll the child in a private school and seek reimbursement for the cost of the private school education from the local education agency." *Cruz*, 134 F.4th at 691. "Reimbursement is granted only when (1) the proposed IEP failed to provide the student with an appropriate public education; (2) the parent's private placement was appropriate to the child's needs; and (3) equitable considerations support the parent's claim." *Jusino v. N.Y.C. Dep't of Educ.*, 700 F. App'x 25, 27 (2d Cir. 2017) (summary order); *see Cruz*, 134 F.4th at 691 ("To determine whether reimbursement is appropriate, we apply the three-part *Burlington/Carter* test . . . ."). Under New York law, the school district "bears the burden of establishing the validity of the IEP,

32

while the parents bear the burden of establishing the appropriateness of the private placement."

*A.N. v. Bd. of Educ. for Iroquois Cent. Sch. Dist.*, 801 F. App'x 35, 36 (2d Cir. 2020).

## III.    DISCUSSION

### A.    The 2021-2022 School Year

#### 1.    Failure to Conduct an FBA and Implement a BIP

Plaintiffs argue that this Court should find the District denied L.S. a FAPE for the 2021-2022 school year because the District committed multiple procedural violations.  (ECF No. 33 ("Ps' Mem.") at 8-13.)  First, Plaintiffs argue the District's failure to complete an FBA and implement a corresponding BIP denied L.S. a FAPE, because it deprived the District and Plaintiffs of critical information about L.S. that was necessary to create an appropriate IEP.  (*Id.* at 8-10.)  Defendant argues the SRO correctly found that the District "adequately identified the student's behaviors in the March 2021 IEP and had addressed them by adding counseling and annual goals related to social-emotional development and addressing anxiety."  (D's Mem. at 12.)

> An FBA provides an identification of a disabled student's problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it.

*M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 139 (2d Cir. 2013).  The failure to conduct an adequate FBA can be "a serious procedural violation because it may prevent the CSE from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all."  *R.E.*, 694 F.3d at 190.  But if an IEP adequately addresses the student's behavior and provides sufficient strategies for dealing with it, the failure to conduct an FBA will not constitute a denial of a FAPE.  *See id.*; *A.C. ex rel. M.C.*, 553 F.3d at 172-73; *see also M.W. ex rel. S.W.*, 725 F.3d at 139-40 (New York regulations require FBA only

"*as necessary* to ascertain the physical, mental, behavioral and emotional factors which contribute to a suspected disability") (emphasis in original).  Thus, "when an FBA is not conducted, the court must take particular care to ensure that the IEP adequately addresses the child's problem behaviors."  *R.E.*, 694 F.3d at 190.

The SRO found that the evidence showed that the CSE adequately identified the Student's behaviors in the March 2021 IEP, as the IEP noted that L.S. tended to perseverate, constantly asked to see the nurse when mildly bothered by something, exhibited anxiety that interfered with his completion of work, and avoided work by asking to use the bathroom.  (SRO Decision at 18-19; *see* D's Ex. 27 at 4.)  The SRO also explained that the CSE recommended individual counseling once per six-day cycle for thirty minutes and that the IEP included two social/emotional goals, which he found to be adequate.  (SRO Decision at 18-19; D's Ex. 27 at 1, 6.)  In support of his analysis, the SRO relied on the March 2021 IEP, the testimony of L.S.'s first-grade teacher, emails from his teacher and L.S.'s report cards.  (*See* SRO Decision at 17-19.)

Courts have found that the failure to conduct an FBA did not constitute a denial of a FAPE in similar circumstances.  For example, in *T.Y. v. New York City Department of Education*, the court deferred to the SRO's decision that the student's IEP adequately addressed behavioral concerns, such that the school district did not deny the student a FAPE, where the record demonstrated that the CSE engaged in a discussion of interfering behaviors; the IEP identified those behaviors, along with strategies and tools to maintain regulation; and the IEP incorporated a related annual goal.  No. 15-CV-1508, 2016 WL 11263665, at \*10 (E.D.N.Y. Aug. 26, 2016), *report and recommendation adopted*, 213 F. Supp. 3d 446 (E.D.N.Y. 2016). The court in *E.E. v. New York City Department of Education* also found that it was reasonable

34

for the SRO to conclude that a student was provided a FAPE despite the failure to conduct an FBA or implement a BIP, where the IEP "both assessed the causes of the Student's problematic behaviors and specified strategies for remedying them." No. 17-CV-2411, 2018 WL 4636984, at *5 (S.D.N.Y. Sept. 26, 2018). Similarly, here, the IEP identified anxiety and lack of confidence as a cause of L.S.'s interfering behaviors and provided strategies to address them, including the goal for L.S. to make positive statements about his qualities and accomplishments, the goal for him to identify situations that cause anxiety and strategies to deal with it, and individual counseling. (*See* D's Ex. 27 at 1, 4, 6.)

Additionally, "[c]ourts finding a violation of the IDEA based upon a failure to conduct a FBA have done so where, unlike here, there was no evidence that the student's interfering behaviors were being adequately managed." *P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ.*, 819 F. Supp. 2d 90, 107 (E.D.N.Y. 2011) (collecting cases); *see A.C. ex rel. M.C.*, 553 F.3d at 172 (failure to perform FBA did not render IEP legally inadequate where student's interfering behaviors declined in frequency over the previous school year); *L.J.B. v. N. Rockland Cent. Sch. Dist.*, 660 F. Supp. 3d 235, 267 (S.D.N.Y. 2023) (FBA not required where student responded positively to interventions that contained maladaptive behaviors and his behavior could be successfully managed in classroom). Here, as the SRO noted, L.S.'s teacher testified that during the 2020-2021 school year, L.S.'s anxiety decreased as the year progressed "due to the strategies he was taught," and that his avoidant behavior occurred less frequently when he received one-to-one support. (SRO Decision at 18.) Additionally, by the time of the CSE meeting in March 2021, L.S. "was able to have appropriate social interactions with his peers and could identify when something was bothering him." (*Id.*) Thus, I agree with the SRO that L.S.'s behaviors

35

were being adequately managed at the time of the March 2021 IEP meeting, such that an FBA was not required.

Further, the Second Circuit has made clear that "whether an IEP adequately addresses a disabled student's behaviors and whether strategies for dealing with those behaviors are appropriate are precisely the type of issues upon which the IDEA requires deference to the expertise of the administrative officers." *M.W. ex rel. S.W.*, 725 F.3d at 140.  In light of this standard, and because the SRO's conclusion is supported by the record and "Plaintiffs have not offered any additional evidence regarding the Student's behavioral record or the necessity for an FBA beyond that which was before the SRO, the Court declines to find that the failure to provide an FBA or BIP here constituted a denial of a FAPE." *M.M. ex rel. A.M. v. N.Y.C. Dep't of Educ. Region 9*, 583 F. Supp. 2d 498, 510 (S.D.N.Y. Oct. 21, 2008); *see also T.Y.*, 2016 WL 11263665, at \*10 (even where some interfering behaviors of which CSE was aware were not addressed, court deferred to "logically sound and adequately supported finding of the SRO that the IEP addressed behavioral concerns appropriately").

### 2. Failure to Evaluate L.S. in All Areas of Suspected Disability

Next, Plaintiffs argue that the District failed to appropriately evaluate L.S. in all areas of suspected disability, including by failing to evaluate his academic functioning and failing to conduct a speech-language evaluation.  (Ps' Mem. at 10-12.)

i. <u>Failure to Conduct Additional Testing Following Testing Discrepancies</u>

First, Plaintiffs argue that the District should have conducted additional educational testing to assess L.S.'s levels of academic functioning because L.S.'s scores in reading and math had declined throughout the year, yet the District believed his test scores did not accurately reflect his true abilities.  (Ps' Mem. at 11.)  The SRO found that the CSE had sufficient

information to identify the Student's present levels of performance and make a determination as to his programming and annual goals, and that the CSE used a variety of assessment tools to evaluate L.S.'s abilities as required, rather than relying on a single measure to gauge the Student's abilities.  (SRO Decision at 15.)

> Under the IDEA, the child must receive a full and individual initial evaluation to determine the existence and extent of their disability and whether they are entitled to special education and related services and is entitled to a reevaluation at least once every three years for the purpose of updating their IEP.

*L.J.B.*, 660 F. Supp. 3d at 258.  Reevaluations may also be conducted if the student's parent or teacher requests a reevaluation, or if the CSE determines a reevaluation is warranted. *See R.B. v. N.Y.C. Dep't of Educ.*, 589 F. App'x 572, 575 (2d Cir. 2014) (summary order). Reevaluations must be comprehensive; evaluate the student in all areas of suspected disability; "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information;" and "not use any single measure or assessment as the sole criterion for determining an appropriate educational program for the child."  *D.S. by and Through M.S. v. Trumbull Bd. of Educ.*, 975 F.3d 152, 162 (2d Cir. 2020); *see L.J.B.*, 660 F. Supp. 3d at 258.

At the March 2021 meeting, the CSE relied on L.S.'s physical examination from January 17, 2020; psychological evaluation from September 16, 2020; physician input form from September 16, 2020; social history update from December 9, 2020; OT evaluation from February 10, 2021; educational evaluation from March 3, 2021; and MAP assessment scores.  (*See* D's Ex. 27 at 2-4.)  From these evaluations, the CSE had the Student's scores on a wide range of tests including the WISC-V, the WOLD Sentence Copying Test, the Beery-Buktenica Development Test of VMI, and the KTEA-III.  (*Id.* at 2-3.)  The CSE also considered reports from L.S.'s teachers regarding his progress in the classroom.  (*See, e.g.*, Tr. 129:22-130:9.)  In addition, at the CSE meeting on September 15, 2021, at which the CSE developed a revised IEP for the

37

2021-2022 school year, the CSE also considered L.S.'s end-of-year report card.  (*See* D's Ex. 48 at 3.)

In light of the foregoing, the record supports the SRO's decision that the CSE considered sufficient current evaluative information to enable it to develop an IEP.  *See L.B. v. N.Y.C. Dep't of Educ.*, No. 15-CV-3176, 2016 WL 5404654, at *11 (S.D.N.Y. Sept. 27, 2016) (rejecting argument that CSE should have ordered additional evaluations of student because CSE had benefit of "wide-ranging progress reports, test results, teacher observations, and social work reports . . . as well as a psycho-educational evaluation from the previous school year"); *T.C. v. N.Y.C. Dep't of Educ.*, No. 15-CV-2667, 2016 WL 4449791, at *17-18 (S.D.N.Y. Aug. 24, 2016) (CSE considered sufficient evaluative information where it considered student's progress reports, classroom evaluation of the student, and psycho-educational evaluation); *R.B. v. N.Y.C. Dep't of Educ.*, No. 12-CV-3763, 2013 WL 5438605, at *9 (S.D.N.Y. Sept. 27, 2013) (SRO properly determined CSE relied on sufficient information to determine student's needs where CSE considered report from student's private school, student's prior IEP, and classroom observation of student), *aff'd*, 589 F. App'x 572 (2d Cir. 2014).

Although there were discrepancies between L.S.'s performance on the educational evaluation and his performance in the classroom, members of the CSE testified as to the suspected reasons for the discrepancy, including that the evaluators were not allowed to prompt or support L.S. to the same degree that his classroom teachers could, (Tr. 346:18-347:6), and that L.S. was anxious during the testing and at times refused to participate, (*id.* at 347:7-12, 493:5-10).  And, as the SRO noted, the discrepancies "do[] not detract from the fact that both the evaluation and the student's classroom performance were providing the CSE with valuable information for the purpose of educational planning."  (SRO Decision at 15.)  Although Plaintiffs

38

argue that the CSE failed to rely on "norm-referenced data," and instead relied on teacher reports, (Ps' Mem. at 11), not only did the CSE consider several standardized tests, but Plaintiffs have not provided any support for the notion that teacher reports are not an acceptable method of evaluation for determining a student's academic functioning.  *See L.B.*, 2016 WL 5404654, at *11 ("Even assuming that the CSE relied *primarily* on . . . teacher estimates, assessments, and progress reports in developing the IEP, such focus would not support a finding of procedural error under the circumstances presented" because those sources "likely provided the most current information available of [the student's] academic performance and scholastic functionality.") (emphasis in original); *S.F. v. N.Y.C. Dep't of Educ.*, No. 11-CV-870, 2011 WL 5419847, at *10 (S.D.N.Y. Nov. 9, 2011) (no evidence that information CSE reviewed needed to be supplemented by additional evaluations where CSE relied in part on teacher estimates of academic functioning).

Additionally, there is no evidence in the record that the Parents objected to the evaluative information the CSE reviewed or requested that the CSE perform additional testing other than an FBA, (*see* D's Ex. 50; D's Ex. 43 at 2), at either the March 2021 or September 2021 meeting, *see R.B.*, 589 F. App'x at 575 (considering whether parents requested additional testing before, during, or after CSE meeting); *S.F.*, 2011 WL 5419847, at *10 (same).  Even now, Plaintiffs do not identify any other additional evaluations that should have been conducted, other than an updated speech-language evaluation, which I discuss below.  Further, where a CSE relies on evaluations, reports and observations in assessing the student's skill levels, the absence of a single measure does not in itself render an IEP invalid.  *See D.B. v. N.Y.C. Dep't of Educ.*, 966 F.

Supp. 2d 315, 330-31 (S.D.N.Y. 2013).  Thus, the failure to perform further evaluations does not constitute a procedural violation or denial of a FAPE.[12]

ii.      Failure to Conduct Speech-Language Evaluation

Plaintiffs also argue that the failure to conduct a speech-language evaluation constituted a procedural violation that amounted to a denial of a FAPE.  (Ps' Mem. at 11-12.)  The SRO found this argument to be without merit, because the evaluative information at the time of the March 2021 CSE did not indicate that the Student required SLT, in that the evaluation from 2019 found the Student's expressive and receptive language skills were within the average range.  (SRO Decision at 15 n.17.)  Plaintiffs argue the SRO erroneously ignored the fact that the lack of data resulted from the CSE's failure to conduct new SLT testing.  (Ps' Mem. at 11.)  Additionally, Plaintiffs argue that the CSE should have known to conduct a speech-language evaluation because L.S. struggled with rhyming, which the CSE overlooked.  (*Id.*)  Defendant argues that there were no indicators that L.S. needed SLT until 2022 when L.S.'s medical provider identified that a tongue tie could be impacting L.S.'s articulation.  (ECF No. 31 ("D's Reply") at 6.)

"[T]he sufficiency of an IEP is to be judged based on the information available at the time."  *L.S. v. Union Free Sch. Dist. of the Tarrytowns*, No. 22-CV-10835, 2024 WL 1859970, at *16 n.20 (S.D.N.Y. Apr. 29, 2024).  At the time of the CSE meeting in March 2021 – and at the time of the follow-up meeting in September 2021 – the most recent speech-language evaluation the CSE had before it was from March 2019, and it concluded that L.S. was in the average range in all areas.  (*See* D's Ex. 65 at 1, 5.)  Based on that evaluation, at the 2019 meeting the CSE and

---

[12] Additionally, although the IHO found that the educational evaluation was insufficiently comprehensive because it did not address the Student's needs related to anxiety, reading, writing, and math, (IHO Decision at 39; SRO Decision at 14-15), the Student's reading, writing, and math skills were in fact assessed using the KTEA-III, (SRO Decision at 15).

L.S.'s parents agreed that L.S. no longer required SLT. (*See* D's Ex. 66 at 2, 4; D's 56.1 ¶¶ 23-26.) Although Plaintiffs argue that Dr. Scalzo's April 2022 report identified L.S.'s articulation issues, the CSE did not have the benefit of that report when developing L.S.'s IEP in March or September 2021. The CSE likewise did not have Dr. Soifer's testimony that L.S.'s struggles with rhyming were red flags for a reading disability, such that SLT would have been necessary, (Tr. 853:6-856:2), at the time that it developed the 2021-2022 IEP. Indeed, Dr. Soifer testified that teachers are often not made aware of the "red flag" of difficulty rhyming. (Tr. 853:23-854:3.) Further, L.S.'s difficulty with rhyming was noted on his 2020-2021 IEP, indicating that he had struggled with this skill in kindergarten, but there was no similar indication that he was still struggling with that skill in first grade or at the time of the March CSE meeting. (*See* D's Ex. 2 at 4; *see also* SRO Decision at 24.) Thus, the expert opinions and L.S.'s difficulty with rhyming cannot support Plaintiffs' position that the failure to conduct an updated evaluation amounted to a procedural violation. *See L.S.*, 2024 WL 1859970, at *16 n.20 (IEP was sufficient despite lack of updated speech-language evaluation where prior evaluation concluded student no longer needed direct SLT and Plaintiffs did not point to any regression or other reason why another evaluation was necessary).

Further, while it is the District's responsibility to ensure that it has sufficient reports and assessments to create an appropriate IEP, it is noteworthy that before the September 2021 follow-up CSE meeting, Plaintiffs – very involved and informed parents – objected to multiple aspects of the 2021-2022 IEP but did not request a speech-language evaluation or object that one had not been conducted. (D's Ex. 43.) *See L.S.*, 2024 WL 1859970, at *16 n.20 (finding IEP sufficient despite no updated speech-language evaluation where parent requested various assessments but did not request speech-language evaluation). And, "[i]f the CSE determines that

no additional data are needed to determine the child's educational needs, the district is not required to conduct such an assessment unless requested by the child's parents." *C.M. v. N.Y.C. Dep't of Educ.*, No. 15-CV-6275, 2017 WL 607579, at *15 (S.D.N.Y. Feb. 14, 2017). Thus, the District's failure to conduct an updated speech-language evaluation is not a procedural violation.

### 3. Parental Participation

Plaintiffs argue the SRO erred in finding the District's procedural violations did not deny Plaintiffs meaningful participation in the development of L.S.'s IEP. (Ps' Mem. at 12-13.) First, Plaintiffs argue the District failed to properly evaluate L.S., which deprived the Parents of critical information. (*Id.* at 13.) But, as already discussed, the District's alleged failure to properly evaluate L.S. in all areas of disability did not amount to a procedural violation that resulted in the denial of a FAPE. (*See supra* III.A.1-2.)

Second, Plaintiffs argue the District failed to consider an ESY, which they allege amounts to a predetermination of educational program and a procedural violation. (Ps' Mem. at 13.) The IHO found that the Parents requested an ESY and the District presented no evidence that the CSE considered L.S.'s amount of regression during a break in instruction. (IHO Decision at 45.) The SRO found the IHO erred in finding the District's failure to recommend twelve-month services for the summer of 2021 resulted in a denial of a FAPE because the IHO used the incorrect standard for evaluating whether a student requires twelve-month services, there was no evidence in the record that L.S. substantially regressed during school breaks, and there was no evidence in the record that the Parents requested the ESY be considered before August 2021 when they sent their notice that L.S. would be attending Windward. (SRO Decision at 27.) Defendant does not address Plaintiffs' argument that the District failed to consider an ESY.

"The IDEA requires that parents of a child with a disability be afforded an opportunity to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child . . . ." *J.E. v. N.Y.C. Dep't of Educ.*, 229 F. Supp. 3d 223, 234 (S.D.N.Y. 2017). "[P]redetermination of a child's IEP without meaningful parental input constitutes a procedural violation of Section 1415, which can rise to the level of a substantive harm, and therefore deprive a child of a FAPE." *Id.* "For an IEP to be predetermined, the district must not have an open mind to consider alternative programs or services during the [CSE] meeting." *Id.* at 235. In other words, although a CSE does not need to adopt a parent's recommendation, "it may not deprive the Parent of meaningful participation by refusing to consider . . . the Parent's concerns." *E.H. v. N.Y.C. Dep't of Educ.*, 164 F. Supp. 3d 539, 551 (S.D.N.Y. 2016).

The SRO erred in finding that there is no evidence in the record that the Parents requested a twelve-month program before the August 10, 2021 notice, and thus his opinion on this matter is not entitled to deference. *See id.* at 553 (declining to defer to SRO's conclusion where SRO's finding was not supported by preponderance of the relevant evidence). The record indicates that the Parents *did* request an ESY, and the District responded by offering L.S. a spot in its Summer Bridges Program, which was a general education summer program different from an ESY, before the Parents sent the notice. (*See* D's Ex. 43 at 3; Tr. 150:2-20, 417:10-418:10.) The District also had a district-wide ESY program, which was a more restrictive program that would be on a student's IEP. (Tr. 417:23-418:10, 517:13-519:6.) There is no indication, however, that the District considered this option for L.S., despite the Parents' request, or that the CSE considered whether L.S. regressed during school breaks. (*See* D's Ex. 43 at 3 (request for ESY was "quickly denied" but "district did not state that [L.S.] did not require such a program"); D's Ex.

27 at 8 (no discussion of ESY in IEP beyond check box that Student was not eligible for program).)  Indeed, the District did not even inform the Parents that it also offered an ESY for students.  (*See* D's Ex. 43 at 3 (District informed Parents "the district only offers a reading program for general education students"); Tr. 1059:22-1060:3 (testimony suggesting District did not inform Parents of ESY option).)  Thus, by failing to even inform the Parents of the option of the ESY within the District, the District "failed to adequately and collaboratively discuss program options and recommendations," *K.R. ex rel. Matthew R. v. N.Y.C. Dep't of Educ.*, 107 F. Supp. 3d 295, 309 (S.D.N.Y. 2015), thereby excluding the Parents from the decision-making process.

Nevertheless, the failure to inform the Parents of the option of the ESY and the failure to consider it did not "so seriously infringe on [the Parents'] participation in the creation or formulation of the IEP that they constitute a denial of [a] FAPE."  *Mr. O. v. Glastonbury Bd. of Educ.*, No. 20-CV-690, 2022 WL 2383906, at *2 (D. Conn. July 1, 2022).  Despite not being informed about the District's ESY program, the Parents knew to request an ESY in the first instance and, after their request was denied, sent a letter formally objecting to the lack of an appropriate ESY.  (*See* D's Ex. 43.)  Additionally, following the Parents' objection, the CSE convened a second meeting to address the Parents' concerns regarding the IEP.  Thus, any procedural violation did not significantly impede the Parents' ability to assess the adequacy of the IEP.  *See J.P. ex rel. J.P v. City of N.Y. Dep't of Educ.*, 717 F. App'x 30, 32 (2d Cir. 2017) (summary order) (no predetermination where record demonstrated "that the CSE heard [parents'] objections, considered materials they submitted, and convened a second meeting to address their objections and explain its reasoning, and that [student's] parents fully participated in both CSE meetings"); *M.M. v. N.Y.C. Dep't of Educ.*, 655 F. App'x 868, 871 (2d Cir. 2016) (summary

order) (violation did not significantly impede parent's participation where parent was involved in important junctures in the development of the IEP and timely objected to student's placement).

Even if the procedural violation did not significantly impede the Parents' opportunity to participate in the decision-making process, a procedural violation may still entitle a plaintiff to relief if it impeded the student's right to a FAPE. *See Mr. P*, 885 F.3d at 748; *Jusino v. N.Y.C. Dep't of Educ.*, No. 14-CV-3617, 2016 WL 9649880, at *6 (E.D.N.Y. Aug. 8, 2016), *aff'd*, 700 F. App'x 25 (2d Cir. 2017) (summary order). But courts have found procedural violations did not amount to a denial of a FAPE where the result would be the same regardless of the violation. *See, e.g.*, *M.W. ex rel. S.W.*, 725 F.3d at 142 (finding omission of parental counseling would not deprive student of FAPE where parent had already received counseling through her own initiative); *Rosenberger v. Banks*, No. 24-CV-6334, 2025 WL 2773299, at *5 (S.D.N.Y. Sept. 29, 2025) (procedural violation in form of delay did not impact parent's ultimate decision to enroll child at private school and thus error did not rise to denial of FAPE). In deciding whether an ESY is required, courts focus on whether a student is likely to regress during the summer break. *See Brennan v. Regional Sch. Dist. No. Bd. of Educ.*, 531 F. Supp. 2d 245, 273 (D. Conn. 2008). Here, there is no evidence in the record that L.S. had previously regressed during breaks from school, and thus there is no evidence that L.S. would have been eligible for an ESY. Therefore, any procedural violation in the CSE's failure to consider an ESY did not deny the Student a FAPE.

### 4.    Annual Goals

Plaintiffs also argue the District substantively denied L.S. a FAPE. (Ps' Mem. at 15.) First, Plaintiffs argue the District failed to provide appropriate and measurable annual goals targeted to L.S.'s needs, such that his IEP was inadequate. (*Id.* at 15-17.) The SRO concluded

that the goals targeted L.S.'s areas of need and that, "[w]hile some of the IEP goals were imprecise and there could have been more goals, or goals that addressed the student's needs with greater specificity," any "shortcomings in drafting the student's IEP goals did not render the IEP so deficient as to amount to a denial of a FAPE." (SRO Decision at 27.)  Plaintiffs argue "the SRO overlooked expert testimony explaining why the goals were not reasonably calculated to enable L.S. to make meaningful progress." (Ps' Mem. at 16.)  The District, on the other hand, maintains that the CSE created goals to specifically address the Student's deficits.  (D's Mem. at 9.)

"An IEP must include a statement of measurable annual goals," *Phillips v. Banks*, No. 23-362, 2024 WL 1208954, at *2 (2d Cir. Mar. 21, 2024), along with "evaluative criteria, evaluation procedures and schedules to be used to measure progress toward meeting the annual goal," *R.B. v. N.Y.C. Dep't of Educ.*, 15 F. Supp. 3d 421, 433 (S.D.N.Y. 2014), *aff'd sub nom. R.B. ex rel. D.B. v. N.Y.C. Dep't of Educ.*, 603 F. App'x 36 (2d Cir. 2015).  The "goals [must] be designed both to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum and to meet each of the child's other educational needs that result from the child's disability." *C.W. ex rel. W.W.*, 171 F. Supp. 3d at 134.  "[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Phillips*, 2024 WL 1208954, at *2.

Here, the March 2021 IEP included eight annual goals to address L.S.'s needs in reading, writing, social emotional development, and motor skills.  (*See* D's Ex. 27 at 6-7.)  Each goal contained evaluative criteria, a method for evaluating progress, and an evaluation schedule.  (*See id.*)  The same is true for the ten goals in the updated September 2021 IEP.  (*See* D's Ex. 48 at 7-

46

8.)  The goals included short-term objectives with evaluative criteria – for example, that "[t]he student will answer the W questions (who, what, where, when, why) after reading a text on his instructional level correctly" in three out of four samples, "write three sentences with proper punctuation and capitalization" in three out of four samples, and "will verbally identify situations where he experiences anxiety."  (D's Ex. 27 at 6-7.)  Courts in this Circuit have held that such short-term objectives are sufficient and offset vague or overly broad goals.  *See J.B. v. N.Y.C. Dep't of Educ.*, 242 F. Supp. 3d 186, 198 (E.D.N.Y. 2017) (short-term objectives like "answering 'wh' questions," and "recognizing negative emotions" supplemented vague annual goals so that they did not constitute denial of FAPE); *D.A.B. v. N.Y.C. Dep't of Educ.*, 973 F. Supp. 2d 344, 357, 359-60 (S.D.N.Y. 2013) (although goals like "student will improve reading skills" were vague, vagueness did not rise to level of denial of FAPE because of significant number of specific short-term objectives with evaluative criteria); *W.T. & K.T. ex rel. J.T. v. Bd. of Educ. of Sch. Dist. of N.Y.C.*, 716 F. Supp. 2d 270, 288-89 (S.D.N.Y. 2010) (short-term objectives like writing eight out of ten sentences containing appropriate capitalization and punctuation clarified broader goals such that they were sufficient).  Accordingly, the goals were not so inappropriate to amount to a denial of a FAPE.

Additionally, although the March IEP did not include a math goal or speech articulation goal, the updated September 2021 IEP did include a math goal, and "an IEP does not need to identify annual goals for every deficit in order to provide a FAPE."  *J.B.*, 242 F. Supp. 3d at 199; *see C.W. ex rel. W.W.*, 171 F. Supp. 3d at 134 (court deferred to SRO's decision that IEP's goals were sufficient even though not every deficit area of the student's functioning had a corresponding goal because goals addressed student's main areas of need).  Here, the SRO found that, as a whole, the IEP contained sufficient goals to address L.S.'s areas of need, noting

47

specifically that the reading goals sought to target decoding, which, according to his teacher, was

L.S.'s "biggest struggle" at the time.  (SRO Decision at 26-27.)  And although the SRO did not

explicitly discuss the testimony of Plaintiffs' expert regarding the IEP's goals, the SRO carefully

reviewed the testimony of the District's witnesses that explained how each goal targeted the

Student's needs in each discipline based on their first-hand experience with L.S.  (SRO Decision

at 26-27.)  *See R.C. ex rel. M.C. v. Byram Hills Sch. Dist.*, 906 F. Supp. 2d 256, 271-72

(S.D.N.Y. 2012) (even though SRO did not specifically address plaintiffs' contentions regarding

adequacy of goals, evidence did not show IEP's reading goals were inadequate where SRO

explained the reading goals that IEP recommended and found them sufficient); *see also G.W. v.*

*Rye City Sch. Dist.*, No. 11-CV-8208, 2013 WL 1286154, at *24 (S.D.N.Y. Mar. 29, 2013)

("[E]ven if the SRO gave greater weight to the District's experts, a court cannot choose between

the competing views of experts on matters of educational policy or substitute its own judgment

for that of the hearing officers which it reviews."), *aff'g judgment*, 554 F. App'x 56 (2d Cir.

2014) (summary order); *McCallion v. Mamaroneck Union Free Sch. Dist.*, No. 10-CV-6207,

2013 WL 237846, at *10 (S.D.N.Y. Jan. 22, 2013) (rejecting argument that "SRO erred by

relying too heavily on the evaluations and opinions of the District's witnesses while giving little

or no weight to the conclusions of Parent's experts").  Accordingly, the SRO's decision is

entitled to deference, and L.S. was not denied a FAPE by virtue of the goals on his 2021-2022

IEP.

### 5.    Appropriateness of Program & Methodology

 Plaintiffs argue the IEP substantively denied L.S. a FAPE because the District failed to

recommend an appropriate program.  (Ps' Mem. at 17.)  Plaintiffs contend that the SRO erred by

concluding that L.S. did not require a specific reading methodology to receive a FAPE, (*id.* at

19), as there was a clear consensus among experts that L.S. required a systematic, multi-sensory structured literacy approach implemented with integrity from start to finish to remediate his dyslexia, but the District "employed a fragmented approach, borrowing materials from various programs without consistency," (*id.* at 17-18).  Plaintiffs specifically argue that the F&P reading program employed by L.S.'s Resource Room teacher was inappropriate, that the time spent on writing was insufficient and that L.S. failed to make progress under a prior, identical IEP, demonstrating that the March 2021 IEP was inadequate.  (*Id.* at 18-19.)  Defendant, in contrast, argues the District used multi-sensory techniques and that L.S.'s teachers should have flexibility to tailor such a program to the Student's needs, which they did.  (D's Reply at 3-4.)

"[T]he IDEA does not require a school district to provide a specific program or employ a specific methodology in providing for the education of children with disabilities."  *L.J.B. v. N. Rockland Cent. Sch. Dist.*, 660 F. Supp. 3d 235, 263 (S.D.N.Y. 2023); *see M.B.*, 2025 WL 2773358, at *11 (rejecting substantive challenge that IEP did not specify particular educational methodology because district not required to do so to satisfy IDEA, and rejecting argument that district needed to use Wilson program with fidelity).  Rather, "the specific teaching methodology is properly left to the teacher's discretion" absent a clear consensus that a specific methodology is necessary.  *M.E. v. N.Y.C. Dep't of Educ.*, No. 22-CV-9642, 2024 WL 1514299, at *12 (S.D.N.Y. Apr. 8, 2024); *see N.K.M.*, 2024 WL 4803941, at *14 (choice of pedagogic methodology appropriately left to teacher).  A clear consensus exists where the evaluative materials present at the CSE meeting recommend a particular methodology, there are no other evaluative materials present that suggest otherwise, and the school district does not conduct any evaluations to call into question the opinions and recommendations contained in the evaluative materials.  *See A.M. v. N.Y.C. Dep't of Educ.*, 845 F.3d 523, 543-45 (2d Cir. 2017).  That some

reports or materials do not mention a specific methodology does not negate a clear consensus. *See R.E.*, 694 F.3d at 194. Finally, "[w]hether an IEP is substantively adequate is undoubtedly a question of educational policy as to which this Court must defer to the expertise of the SRO." *G.W.*, 2013 WL 1286154, at \*18.

The SRO spent significant time reviewing the IEP's approach to reading instruction. (*See* SRO Decision at 19-25.) The SRO concluded that the IHO erred in relying on the testimony of Plaintiffs' expert that the Student needed the Orton-Gillingham methodology in order to receive an educational benefit and on Dr. Scalzo's evaluation from April 2022, because neither the testimony nor the report was before the March 2021 CSE (or, the Court notes, the September 2021 CSE) for consideration. (SRO Decision at 24-25.) Without this evidence, the SRO found there was no clear consensus at the time of the CSE meeting that L.S. required one methodology to the exclusion of all others to receive an educational benefit. (*Id.* at 25.) I agree. While it is true that an IEP is not reasonably calculated to enable a student to receive educational benefits when it fails to provide services consistent with a clear consensus, that consensus must arise from "the reports and evaluative materials *present at the CSE meeting*." *A.M.*, 845 F.3d at 543 (emphasis added). Although there is some evidence in the record that L.S. required the Orton-Gillingham method or that L.S. needed to use only one method rather than a combination of a few, there was no such evidence before the CSE in March or September 2021, as the testimony and report of Plaintiffs' experts on the matter occurred after those meetings, and thus should not be considered. *See T.G. ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 973 F. Supp. 2d 320, 342 n.19 (S.D.N.Y. 2013) (explaining that an "IEP may not be rendered inadequate through testimony by witnesses who did not appear before the CSE about subsequent events and evaluations that seek to alter the information available to the CSE" and finding that IHO and SRO erroneously relied

50

on testimony of witnesses who were not at the CSE, did not submit exhibits to the CSE, and based their testimony on the adequacy of the student's private school program, "which could not have been before the CSE in formulating the IEP for that same year").

In any event, I note that Dr. Scalzo's report only recommends a "multi-sensory, phonics-based, systematic" approach for reading and writing. (D's Ex. 55 at 14.) The Wilson reading system that the District employed was described as "a systematic phonics program" that is "multi-sensory," like Orton-Gillingham. (Tr. 595:5-16, 596:13-24.) Thus, even considering Dr. Scalzo's report, there was no "clear consensus" that L.S. required the specific method of Orton-Gillingham to the exclusion of all others, including the Wilson method he received. *See N.K.M.*, 2024 WL 4803941, at *14 (failure to recommend Orton-Gillingham program did not render IEP inadequate where student would receive a multi-sensory approach to reading and other supports); *C.S. v. Yorktown Cent. Sch. Dist.*, No. 16-CV-9950, 2018 WL 1627262, at *27 (S.D.N.Y. Mar. 30, 2018) (no evidence demonstrating clear consensus that student required Orton-Gillingham instruction where expert recommended only that student have hybrid model for reading that targeted ability to decode, fluency, and reading comprehension).

Thus, the record supports the SRO's conclusion that the CSE was not required to mandate solely one program and that it was permissible for the teacher to use the approaches she did, and his opinion is owed deference. *See C.S.*, 2018 WL 1627262, at *16 ("The SRO's conclusion, based on an evaluation of whether the educational methods chosen were proper and the testimony of the District's trained educators, is owed deference."); *R.B.*, 2013 WL 5438605, at *8 ("[D]ecisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress.").

51

Further, Plaintiffs contend that L.S. failed to make progress under the March 24, 2021 IEP and thus the nearly identical IEP for the 2021-2022 school year could not have been sufficient. (Ps' Mem. at 18-19.) Defendant argues that L.S. made progress through the District's program, including the March 2021 addition of Resource Room services. (D's Reply at 4.) The SRO did not explicitly address this argument. The IHO found that the Student "did not progress in reading during the 1st grade because he could not read." (IHO Decision at 40.)

The IHO's finding, however, is not supported by the record. The appropriateness of an IEP should be evaluated as of the time it was made. *See J.S. v. N.Y.C. Dep't of Educ.*, 104 F. Supp. 3d 392, 402 (S.D.N.Y. 2015). Thus, an IEP must take into account what was objectively reasonable when the IEP was promulgated. *See id.* At the time of the CSE meeting on March 15, 2021, when the CSE first developed L.S.'s IEP for the upcoming school year, L.S.'s teachers recognized that he needed more support than was being provided in the RTI program. (Tr. 106:15-107:8, 381:10-18, 395:16-397:24, 405:13-406:4.) Thus, the members of the CSE commendably recommended that Resource Room be added immediately and for the following year. (D's Ex. 27 at 1.) At the time that Resource Room was added in March, the IEP was objectively reasonable because it provided additional support, and there was no evidence that Resource Room would not be sufficient.

By the time of the September 2021 follow-up CSE meeting, at which L.S.'s IEP was amended for the 2021-2022 school year, L.S. had received Resource Room services from March through June, and thus the CSE could evaluate whether that program was working. Contrary to the IHO's decision, I find that the record shows that L.S. made progress under the March 24, 2021 IEP with the addition of Resource Room. L.S. began first grade reading at a F&P level B, and had only progressed to a level D, which was still below grade level, before receiving

Resource Room services in March.  (*See* D's Ex. 27 at 3.)  But by May 2021, after receiving

Resource Room services for less than two months, L.S.'s teacher reported that L.S. had moved

from a level D to a level G, which she characterized as "[h]uge progress."  (D's Ex. 38.)

Although L.S.'s test scores on the educational evaluations and MAP assessments undoubtedly

showed that L.S. was struggling academically, those tests were taken before L.S. began to

receive Resource Room services, and thus they do not show that Resource Room services were

insufficient.  (*See* D's Ex. 27 at 2-4 (noting educational evaluation completed March 3, 2021 and

noting MAP assessment scores); D's Ex. 29 (Resource Room added after March 15, 2021).)

Further, although L.S.'s report card shows a level of decline, his teacher testified that he still

made progress throughout the year.  (Tr. 200:13-201:10.)  Accordingly, I do not find that this is a

case in which the IEP was inappropriate because the CSE merely copied an IEP which had failed

to produce any gains in a prior year, as Plaintiffs suggest.  *See P.C.*, 232 F. Supp. 3d at 414

(acknowledging it would be questionable to use identical IEP if student made no progress on

same IEP before); *Carlisle Area Sch. v. Scott P. by and Through Bess P.*, 62 F.3d 520, 534 (3d

Cir. 1995) (same).

Similarly, although Plaintiffs argue that L.S.'s writing needs were inadequately addressed

in the IEP with only fifteen minutes per six-day cycle on writing instruction, the Student's

Resource Room teacher testified that her understanding at the time that she worked with L.S. in

the Resource Room was that his writing deficit was tied to his fine motor deficit, (Tr. 487:12-

18), which was addressed in his IEP for the 2021-2022 school year through motor skills goals

and OT, (*see* D's Ex. 27 at 1, 6-7).  Accordingly, I find that the evidence in the record shows that

the IEP was tailored to L.S.'s specific needs and reasonably calculated to enable L.S. to benefit

in light of the circumstances.

### 6.    Appropriate Related Services

Plaintiffs argue that the District failed to provide appropriate related services to L.S. because it failed to provide SLT.  (Ps' Mem. at 20.)  But as already explained, at the time of the CSE meeting in March 2021 – and at the time of the follow-up meeting in September 2021 – the most recent speech-language evaluation the CSE had before it concluded that L.S. was in the average range in all areas.  (*See* D's Ex. 65 at 5.)  Based on that evaluation, at the CSE meeting in 2019, the CSE and L.S.'s parents agreed that L.S. no longer required SLT.  (*See* D's Ex. 66 at 2, 4; D's 56.1 ¶¶ 23-26.)  Because "the sufficiency of an IEP is to be judged based on the information available at the time," *L.S.*, 2024 WL 1859970, at \*16 n.20, I cannot say that the failure to provide SLT for the 2021-2022 school year amounted to a denial of a FAPE.

Accordingly, I find that the SRO did not err in concluding that the District provided a FAPE for L.S. for the 2021-2022 school year.

### B.    The 2022-2023 School Year

Plaintiffs argue the District committed multiple procedural violations that cumulatively denied L.S. a FAPE for the 2022-2023 school year, and that the District substantively denied L.S. a FAPE.  (Ps' Mem. at 13, 20.)

### 1.    Failure to Adequately Evaluate L.S.

Plaintiffs first argue that the IEP was procedurally deficient because the District failed to appropriately evaluate L.S. in all areas of suspected disability, in that it did not recommend a speech-language evaluation despite having Dr. Scalzo's report prior to the May 2022 CSE meeting.  (Ps' Mem. at 13-14.)  Neither the SRO nor the IHO addressed the failure to recommend a speech-language evaluation.  Instead, the IHO found "that the lack of CSE

evaluations to support the decision not to provide full-time multi-sensory instruction impeded the parent's opportunity to participate in the decision making process." (IHO Decision at 49.)

Focusing on the arguments Plaintiffs make here, I find that even though the CSE did not conduct an updated speech-language evaluation of L.S., the CSE relied on sufficient information to develop L.S.'s IEP, and thus there was no procedural violation. *See S.Y. v. N.Y.C. Dep't of Educ.*, 210 F. Supp. 3d 556, 568 (S.D.N.Y. 2016) (no denial of FAPE even though district did not evaluate student in all areas where CSE had sufficient information about student and needs based on other evaluations and reports from private school); *R.B.*, 2013 WL 5438605, at *9 (CSE relied on sufficient information to determine student's needs where CSE considered report from student's private school, student's prior IEP, and classroom observation of student). Indeed, the CSE reviewed Dr. Scalzo's report, and Dr. Scalzo was present at the May 27, 2022 meeting to discuss her findings and recommendations with respect to L.S.'s speech deficits. (*See* D's Ex. 61 at 1, 3.) It is not clear, and Plaintiffs do not suggest, what information the District's own evaluation would reveal that was not already provided in Dr. Scalzo's evaluation. Therefore, the District's failure to conduct an updated evaluation did not amount to a procedural violation that denied L.S. a FAPE.

### 2.    Parental Participation

Next, Plaintiffs argue the District denied the Parents the opportunity for meaningful participation in the development of L.S.'s IEP because the District planned to continue the same combination of Wilson, F&P and basic writing instruction despite the Parents' belief that that combination had been unsuccessful in the past and that L.S. should instead continue the PAF program. (Ps' Mem. at 14.) Plaintiffs appear to argue that the CSE failed to even consider the PAF program. (*See id.*; Tr. 1073:8-1074:15.) The SRO did not address this argument, but the

55

IHO briefly addressed it, finding that "there was no discussion of the methodology of PAF or what reading program or writing program would be offered as a support," and concluding that that procedural inadequacy impeded the Parents' participation in the decision-making process and denied L.S. a FAPE. (IHO Decision at 50-51.)

Because the SRO did not address this issue, deference is owed to the IHO's opinion where it is supported by the record. *See K.R.*, 107 F. Supp. 3d at 311 (deferring to IHO's conclusion where SRO did not address issue); *F.O. v. N.Y.C. Dep't of Educ.*, 976 F. Supp. 2d 499, 521 (S.D.N.Y. 2013) (deference owed to IHO's opinion where SRO did not address issue and IHO's opinion was overwhelmingly supported by the evidence); *D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 513 (S.D.N.Y. 2013) (IHO's decision entitled to deference where IHO's reasoning was persuasive and SRO did not reach issue); *see also M.H.*, 685 F.3d at 241 ("The SRO's or IHO's factual findings must be reasoned and supported by the record to warrant deference."). Here, the IHO's factual finding is supported by the record, as L.S.'s mother testified that the CSE did not discuss its willingness or ability to continue the PAF program that the Windward representative had described at the meeting. (Tr. 1074:12-15.) L.S.'s special education teacher, who was part of the CSE, testified that they did not discuss continuing the PAF program in the 2022-2023 school year. (Tr. 501:5-8.) L.S.'s IEP does not mention any discussion regarding the PAF program or the reading methodology to be used, (*see* D's Ex. 61 at 1-2), and the recording from the May 2022 CSE meeting confirms that the CSE did not discuss continuing with PAF or exclusively employing Orton-Gillingham or any other similar intensive, multi-sensory program, (*see generally* Ps' Ex. N).

Although "the [District] had no obligation to replicate the services the Parent[s] preferred," if a district fails to consider whether a student needs a specific program – even one

that it does not or cannot provide – that amounts to predetermination of the student's education program regardless of what the student needed or what the student's parents contributed to the process. *E.H.*, 164 F. Supp. 3d at 552; *see J.E.*, 229 F. Supp. 3d at 237. That the CSE here did not even discuss continuing the PAF demonstrates that it failed to consider that program, thereby predetermining L.S.'s program and committing a procedural violation. *See J.E.*, 229 F. Supp. 3d at 236 (record reflected that CSE failed to consider options desired by parent where district psychologist and representative did not remember whether discussion on parent's desired program took place and meeting minutes did not reflect that discussion took place).

Nevertheless, as previously discussed, although predetermination is a procedural violation, such violations only warrant tuition reimbursement "if they impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process, or caused a deprivation of educational benefits." *See J.E.*, 229 F. Supp. 3d at 238. I do not agree with the IHO that the violation here significantly impeded the Parents' right to participate in the decision-making process, because the record reflects meaningful and active participation by the Parents, including L.S.'s mother's participation in the CSE meeting, at which those present discussed Dr. Scalzo's recommendations and L.S.'s progress at Windward and the Parents asked questions and raised concerns about L.S. and the proposed program. (*See* Ps' Ex. N; D's Ex. 61.) *See B.K. v. N.Y.C. Dep't of Educ.*, 12 F. Supp. 3d 343, 359 (E.D.N.Y. 2014) (no denial of meaningful participation where parents participated at CSE meetings and made requests, and district sought parents' input prior to meeting); *Dirocco ex rel. M.D. v. Bd. of Educ. of Beacon City Sch. Dist.*, No. 11-CV-3897, 2013 WL 25959, at \*18 (S.D.N.Y. Jan. 2, 2013) (procedural violation did not significantly impede parents' opportunity to participate where parents engaged in extensive dialogue with CSE members, expressed dissatisfaction with

proposal, discussed doctor's recommendation and provided information regarding child's progress at private school).  Nonetheless, I find that this procedural violation warrants tuition reimbursement because, by failing to consider the PAF or a similar program after the Windward representative described L.S.'s progress, the CSE failed to consider the child's needs when formulating his educational program and thus impeded L.S.'s right to a FAPE.  *Cf. E.H.*, 164 F. Supp. 3d at 553 (CSE should have considered increased support in light of student's then-placement at private school where student received such support because IEP recommendation must be based on student's individual needs).

Even if this procedural violation did not amount to a denial of a FAPE, however, I find that the 2022-2023 IEP was substantively inadequate and denied L.S. a FAPE, as discussed in more detail below.

### 3.    Failure to Appropriately Consider Evaluative Data & Recommend an Appropriate Program

Plaintiffs argue the CSE failed to adhere to the consensus of Dr. Scalzo and the Windward representative who attended the May 2022 IEP meeting that L.S. needed a small classroom with significant support as well as a systematic reading program.  (Ps' Mem. at 21-22.)  Plaintiffs further argue that the CSE failed to incorporate Dr. Scalzo's recommendations regarding L.S.'s need for intensive, individualized, multi-sensory, phonics-based instruction. (*Id.* at 23.)  As a result, Plaintiffs argue the program proposed – an ICT class – was insufficient. (*Id.*; ECF No. 36 ("Ps' Reply") at 7-8.)  The District argues that L.S. would have received the specialized instruction, intensive interventions and scaffolding that Dr. Scalzo recommended as part of the ICT program, and that the ICT program, which was a more restrictive environment than Resource Room (but less restrictive than full-time special education), was appropriate based on the evaluations the CSE reviewed.  (D's Mem. at 14; D's Reply at 7-8.)  The SRO did not

58

address whether the ICT recommendation rendered the IEP substantively inadequate because he found that the District denied L.S. a FAPE for other reasons.  The IHO, however, found that the District denied L.S. a FAPE by departing from Dr. Scalzo's recommendation to provide full-time multi-sensory instruction without providing an evaluation to support its recommendation for ICT placement.  (IHO Decision at 49-50.)  The IHO also found it was not appropriate to replace Resource Room with ICT.  (*Id.* at 49.)

The IHO's findings are supported by the record.  First, Dr. Scalzo's report and testimony indicated that L.S. required a multi-sensory, phonics-based program that was implemented with "consistency, intensity and fidelity . . . and integrity."  (D's Ex. 55 at 14.)  But Dr. Scalzo testified that she did not understand how a phonics-based reading program could be implemented in that manner in the ICT class.  (Tr. 762:19-763:15, 764:3-765:5.)  Indeed, the testimony of the District's own witnesses indicated that L.S. would not receive multi-sensory, phonics-based instruction in the ICT classroom in that manner, as the ICT classroom instead used a "balanced literacy approach."  (*See* Tr. 581:9-20 (balanced literacy approach is used in ICT classroom); *id.* 448:22-449:8 (explaining difference between balanced literacy approach and systematic, phonics reading program like Wilson); *id.* 500:2-16 (student would not exclusively receive Wilson instruction in ICT class).)

Additionally, both Dr. Scalzo and the Windward representative who attended the May 2022 CSE meeting expressed their disagreement with the ICT recommendation, stating that L.S. required a small class environment and specialized instruction.  (*See* D's Ex. 61 at 2; Tr. 762:19-763:15, 764:3-20.)  Further, in her report, Dr. Scalzo recommended that L.S. continue in a full-time special education environment, (D's Ex. 55 at 14), which the District did not offer through its ICT placement, (*see* Tr. 577:12-17 (describing ICT class as a general education class)).  Dr.

Scalzo also explained that L.S. required more individualized instruction in a pull-out format like the Resource Room.  (Tr. 766:2-9.)  L.S.'s teachers also recognized that he benefitted from one-on-one attention that was not available in a class of twenty or twenty-one students, like the ICT class.  (Tr. 67:14-24, 762:19-24.)  Nevertheless, the Resource Room was removed from L.S.'s IEP.  (*See generally* D's Ex. 61.)

Based on the foregoing, I find that the information presented at the CSE meeting yielded a clear consensus that L.S. required a small class environment with individualized instruction in which a systematic, multi-sensory, phonics-based reading program could be implemented with consistency, intensity, and fidelity, thereby rendering such instruction a necessary component of any plan reasonably calculated to enable L.S. to receive educational benefits.  Because, as explained above, the proposed ICT program would not provide such instruction, the 2022-2023 IEP was not reasonably calculated to provide educational benefits to L.S.  *See A.M.*, 845 F.3d at 543 (explaining that where there is a clear consensus that student requires specific content, methodology, or delivery of instruction, services inconsistent with that consensus are not reasonably calculated to provide educational benefits).  Further, "[c]ourts have specifically identified the question of whether . . . ICT services are appropriate as one of these issues of educational policy where a certain degree of deference is appropriate."  *S.W. v. N.Y. Dep't of Educ.*, 92 F. Supp. 3d 143, 161 (S.D.N.Y. 2015); *see J.S.*, 104 F. Supp. 3d. at 409 ("Because the IHO . . . ha[s] far greater expertise than this Court, . . . deference is due to the administrative officers" with respect to the appropriateness of the ICT recommendation).  Therefore, I defer to the IHO's decision, which is supported by the administrative record, that the ICT recommendation was not supported and denied L.S. a FAPE.

####        4.        Failure to Provide Appropriate & Measurable Annual Goals

Plaintiffs also argue that the IEP's goals were inadequate, because (1) the goal to decode words was vague, (2) the goal to read an instructional text orally with accuracy at eighty words per minute was unrealistic, and (3) the goal to answer three inferential questions after reading a text on L.S.'s instructional level was vague with no clear explanation of how he would be taught to accomplish this.  (Ps' Mem. at 22.)  The District did not specifically address these goals, and instead focused on the social/emotional goal, arguing that it was adequate because it directly correlated with the results of Dr. Scalzo's testing.  (D's Mem. at 15.)  The SRO also did not address the adequacy of the IEP's goals, but the IHO credited the testimony of Dr. Scalzo that the goals were inappropriate, were insufficient to remediate dyslexia and significantly impeded the Parents' opportunity to participate in the decision-making process.  (IHO Decision at 49.)

Although I disagree with Plaintiffs' argument that the vagueness of the goals rendered them inadequate, *see J.B.*, 242 F. Supp. 3d at 198 (goals not so vague as to amount to denial of FAPE because they contained short-term objectives and evaluative criteria), and that one of the goals was inappropriate because it was unrealistic, *see Killoran ex rel. A.K. v. Westhampton Beach Sch. Dist.*, No. 19-CV-3298, 2021 WL 4776720, at *12 (E.D.N.Y. Oct. 11, 2021) (IEP "must be appropriately ambitious in light of [student's] circumstances, and set forth challenging objectives"), *aff'd sub nom. Killoran v. Westhampton Beach UFSD*, No. 21-2647, 2023 WL 4503151 (2d Cir. July 13, 2023) (summary order), evidence in the record supports the IHO's finding that the reading goals were otherwise inappropriate.  Plaintiffs' expert, Dr. Soifer, testified that the goals were not appropriate for L.S.'s needs, and seemed to be "all just thrown together."  (Tr. 901:6-903:3.)  And although Dr. Scalzo testified that L.S. could make progress under these goals, the goals were "general reading goals" not specific to dyslexia, lacked the

61

kind of systematic measurement necessary to remediate dyslexia, and would therefore not properly address L.S.'s condition.  (Tr. 769:4-770:5.)  In other words, the reading goals were not specifically tailored to L.S.'s needs.  *See C.W. ex rel. W.W.*, 171 F. Supp. 3d at 134 (goals must be designed to meet the child's needs that result from the child's disability).

Accordingly, because the IHO's finding is supported by the record, and "the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers," *Phillips*, 2024 WL 1208954, at *2, I defer to the IHO's decision that the goals were inadequate and denied L.S. a FAPE.

### 5.      Failure to Offer SLT

Finally, Plaintiffs argue the SRO correctly held that the District failed to offer L.S. a FAPE by failing to provide SLT, despite having Dr. Scalzo's report at the time of the May 2022 meeting.  (Ps' Mem. at 23.)  The District argues that the CSE appropriately did not recommend SLT at that meeting because L.S.'s private evaluator stated that SLT would be premature until L.S.'s tongue tie had been corrected, a subsequent private evaluation recommended only medical intervention, and the District's own subsequent evaluation demonstrated that L.S.'s skills were in the average range.  (D's Mem. at 16-17.)  The IHO did not specifically address the failure to provide SLT but did find that the CSE failed to follow Dr. Scalzo's recommendations, which included the recommendation for SLT.  (IHO Decision at 48-49; *see* SRO Decision at 33-34.)  The SRO found that it was sufficiently clear that L.S. had phonological processing problems unrelated to his articulation difficulties that warranted a recommendation for SLT at the time of the May 2022 meeting, and that the failure to make that recommendation resulted in the denial of a FAPE.  (SRO Decision at 36.)

The SRO's decision on this point is well-reasoned and thorough, as he carefully reviewed L.S.'s history of SLT, Dr. Scalzo's findings with respect to L.S.'s speech deficits from her April 2022 report, the discussion at the CSE meeting, and the private evaluator's report. (*See id.* at 34-37.) The SRO's review of the record demonstrated that Dr. Scalzo's report, reviewed at the CSE meeting, diagnosed L.S. with a speech-sound disorder and recommended SLT to remediate his speech articulation. (*See* D's Ex. 55 at 13-15.) Additionally, after being presented with evidence from Dr. Scalzo and L.S.'s parent that L.S.'s speech-sound disorder was tied to his deficits in language processing, phonological processing and retrieval, and was thus impacting his reading and writing, (SRO Decision at 34; D's Ex. 55 at 9; Ps' Ex. N at 30:02-31:38), the CSE chairperson indicated that it sounded like speech and language were areas of concern that they may want to address, (Ps' Ex. N at 32:32-37). Thus, even though Dr. Scalzo's report indicated that L.S. should be evaluated prior to any intervention, and even though L.S.'s mother seemed content to revisit the issue once the private evaluator issued a formal report, (Ps' Ex. N at 32:44-32:53), the CSE was clearly aware at the time of the CSE meeting that L.S. required remediation of his speech and indeed that it was critical to addressing his other educational deficits, but failed to recommend appropriate services. The CSE's failure to recommend SLT as opposed to just an evaluation resulted in a proposed program that was not reasonably calculated to enable L.S. to receive educational benefits. *See A.M.*, 845 F.3d at 544-45 (in absence of district's own evaluation calling private evaluator's recommendation into question, recommendation against views of evaluator resulted in program not reasonably calculated to enable student to receive educational benefits).

Even if it was not clear that L.S. needed SLT for his phonological processing issues at that time, in light of Dr. Scalzo's statement that L.S. "maybe" should have SLT to address them,

(Ps' Ex. N at 8:01-8:16), L.S.'s mother indicated at the CSE meeting that the private evaluator had said that one of the preliminary steps to addressing L.S.'s deficit included strengthening the muscles in L.S.'s mouth, (*id.* at 31:44-55; *see* SRO Decision at 35).  It thus was at least clear that he would need SLT to strengthen the muscles in his mouth before medical intervention and for his articulation issues regardless of what medical intervention occurred.  Thus, Defendant's argument that SLT would have been premature until L.S.'s tongue tie was medically addressed, (D's Mem. at 16-17), fails.

Overall, because the SRO's decision is supported by the record, this Court's review is based entirely on the same evidence as that before the SRO, and the IHO and SRO decisions are in agreement, deference to the SRO's decision is warranted.  *See P.C.*, 232 F. Supp. 3d at 407, 410.  According due weight to the SRO's reasoned conclusion, I agree that the failure to provide SLT denied L.S. a FAPE for the 2022-2023 school year.

### C.    Unilateral Placement at Windward

Having found that the District failed to provide L.S. a FAPE for the 2022-2023 school year, pursuant to the *Burlington/Carter* test I must now determine whether the Parents' private placement was appropriate and whether equitable considerations favor reimbursement.  *See Jusino*, 700 F. App'x at 27.

#### 1.    Appropriateness of Placement

The Parents bear the burden of demonstrating that the private placement is appropriate.  *See Frank G.*, 459 F.3d at 364.  "An appropriate private placement need not meet state education standards or requirements," *id.*, and does not have to meet the IDEA definition of a FAPE, *see id.*; *M.H.*, 685 F.3d at 252.  Nevertheless, "the same considerations and criteria that apply in determining whether the School District's placement is appropriate should be considered in

64

determining the appropriateness of the parents' placement.  Ultimately, the issue turns on whether a placement – public or private – is reasonably calculated to enable the child to receive educational benefits." *Frank G.*, 459 F.3d at 364.

> No one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits.  Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs.

*Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007); *see D.C. ex rel. E.B.*, 950 F. Supp. 2d at 513 ("While evidence of a student's success at the unilateral placement is relevant to the court's review, such evidence is not sufficient by itself to establish that the placement was appropriate.").

Here, the SRO focused on the question of whether the Parents had provided sufficient evidence to show that the educational program offered to the Student at Windward, as well as services offered out of school, were appropriate to meet L.S.'s educational needs.  (SRO Decision at 38.)  The SRO reviewed the IHO's findings, the relevant caselaw as to a unilateral placement's failure to provide related services, the Parents' expert's testimony regarding L.S.'s progress at Windward, and the related services offered – or more accurately, not offered – at Windward.  (SRO Decision at 38-41.)  The SRO did not, however, address Dr. Scalzo's follow-up evaluation in 2023, after L.S.'s third-grade year at Windward.

The SRO explained that the hearing record showed that Windward provided L.S. with specialized instruction in language arts using the Orton-Gillingham approach to reading, spelling and handwriting with a focus on decoding, developing sight vocabulary of irregular words, building fluency, reading comprehension, spelling, and writing linguistically complex sentences and well-developed paragraphs.  (*Id.* at 39.)  The Parents' expert witness also testified that L.S.

was in a small class with about six students, but could not remember exactly as she had gotten the information from Windward's CSE liaison. (*Id.* at 40.) She further testified that Windward did not provide OT or counseling, but that L.S. did not require counseling at Windward because he did not feel different or unable to learn while there. (*Id.* at 40-41.) The SRO ultimately found that the Parents' expert's testimony was neither weighty nor convincing, as she had not spoken to L.S.'s teachers or observed L.S. in school. (*Id.* at 41.)

After reviewing the record, the SRO found the evidence regarding the related services that the Parents obtained was "very scant at best," and concluded that "[i]t would defy logic and the Supreme Court's holding in *Carter* to find what the district did was inappropriate under *Rowley*, and then find that similar evidence passed muster as proper under the Act and reasonably calculated to enable the student to receive educational benefits with regard to the unilateral placement." (*Id.*) The SRO did not clearly state what Windward lacked, but seemed to refer to the lack of related services like OT, counseling and SLT. (*See id.* (emphasizing requirement that parents demonstrate student's educational instruction be supported by such services as necessary to permit student to benefit from instruction).)

Plaintiffs argue the SRO used the incorrect standard for assessing the appropriateness of the Parents' placement. (Ps' Mem. at 24.) Plaintiffs also argue that the SRO dismissed the private services that the Parents provided as insufficient without explanation. (*Id.*) The District argues the SRO correctly found that the Parents had failed to provide objective evidence that Windward provided an appropriate education because none of Plaintiffs' witnesses had direct knowledge of L.S.'s program or progress. (D's Mem. at 18.) The District further contends that the evidence shows that L.S. regressed while at Windward because it did not have the proper

66

supports in place to address L.S.'s OT and social/emotional needs or his speech-language deficits. (*Id.* at 19-20.)

I agree with Plaintiffs that the SRO's decision that the unilateral placement was inappropriate lacks support in the record. To be sure, the SRO is not required to give weight to the testimony of L.S.'s expert, *see Scott v. N.Y.C. Dep't of Educ.*, 6 F. Supp. 3d 424, 444 (S.D.N.Y. 2014) (suggesting that, although SRO may not make impermissible credibility assessment, SRO may reconsider the weight of the evidence), and the SRO explained his reasons for not doing so, (SRO Decision at 41 (explaining testimony was not weighty or convincing because expert did not speak to student's teachers or observe student at Windward)). But he dismissed that testimony without addressing the facts (acknowledged in part earlier in his decision, (*see id.* at 39)), that the expert had been affiliated with Windward for thirty-five years, taught numerous courses to its teachers, and provided consultation and mentoring to teachers in the school, (Tr. 919:13-923:19), and thus had a deep understanding of its program. Further, the SRO failed to address key evidence, including the testimony and updated evaluation of Dr. Scalzo, and other evidence of L.S.'s progress at Windward such as his scores on standardized tests, which showed marked improvement. *See F.O.*, 976 F. Supp. 2d at 513 (declining to defer to SRO's determination as to adequacy of IEP because it was inadequately reasoned as it did not address in any substantive way testimony of student's treating physician who testified at hearing); *G.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 581 (S.D.N.Y. 2010) (declining to defer to SRO's decision where the SRO failed to properly consider expert testimony and other evidence), *aff'd*, 486 F. App'x 954 (2d Cir. 2012) (summary order). And although he noted that the evidence of outside services was "scant," he acknowledged that L.S. was receiving outside services, (SRO Decision at 40 ("The parent confirmed that the student had

been receiving counseling, and that both OT and counseling were obtained privately by the parents.")), did not explain why these services were insufficient, and did not explain why the program at Windward was otherwise inappropriate. *See S.C. v. Katonah-Lewisboro Cent. Sch. Dist.*, 175 F. Supp. 3d 237, 255 (S.D.N.Y. 2016) (declining to defer to SRO who acknowledged evidence but failed to seriously grapple with it or explain why it was outweighed by contrary evidence), *aff'd sub nom. J.C. v. Katonah-Lewisboro Sch. Dist.*, 690 F. App'x 53 (2d Cir. 2017) (summary order); *Scott*, 6 F. Supp. 3d at 441 (SRO decision did not merit deference in part because the SRO failed to carefully consider all the evidence and opinion was insufficiently reasoned). He also overlooked the evidence that L.S. was receiving speech-language therapy outside of Windward. (*See* Ps' Ex. R at 1; Ps' Ex. LL at 1; Tr. 816:12-15.)

Further, the analysis that the SRO did conduct was flawed. To the extent the SRO found that the lack of related services at Windward rendered it an inappropriate placement, "the fact that [L.S.] did not receive the related services exactly as they were outlined in [his] IEP . . . does not make [Windward] inappropriate." *M.M. v. N.Y.C. Dep't of Educ.*, No. 21-CV-3693, 2024 WL 3904771, at *7 (E.D.N.Y. Aug. 22, 2024) (failure of private school to provide OT and SLT did not render placement inappropriate where placement tailored student's education to her needs and student progressed); *see T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 878 (2d Cir. 2016) (error for IHO and SRO to conclude private school was not appropriate because it offered inadequate OT, SLT and counseling services). Because the failure to include services properly recommended in an IEP does not necessarily render a private placement inappropriate, *T.K.*, 810 F.3d at 878, and "parents bear a lower burden to demonstrate the appropriateness of a private placement than school districts do to demonstrate the provision of a FAPE," *id.*, the SRO was

68

incorrect in concluding that Windward was not appropriate simply because omitting SLT amounted to the denial of a FAPE on the District's part.

Similarly, Defendant argues that private placement is not proper where it does not "'provide some element of special education services in which the public school placement was deficient.'" (D's Mem. at 18 (quoting *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 523 (6th Cir. 2003).) Although the SRO found that the IEP was deficient solely for its failure to provide SLT, I find, as explained above, that the IEP was deficient for other reasons, including the failure to offer systematic multi-sensory, phonics-based instruction with consistency, intensity and fidelity in a small class with individualized instruction. The evidence in the record supports that Windward remedied this deficiency, as the school uses the Orton-Gillingham method of instruction, which was described as a multi-sensory, phonics-based, systematic approach for reading and writing instruction, (D's Ex. 55 at 14; Tr. 596:20-24; Ps' Ex. LL at 2), and has class sizes of about six students, (Tr. 965:8-16; *see* SRO Decision at 39-40). Thus, Defendant's argument fails.

Additionally, this is not a case in which "the chief benefits of the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not." *M.H.*, 712 F. Supp. 2d at 163. Rather, Windward provided instruction that was specifically designed to meet L.S.'s unique needs with respect to his reading deficits. *See Greenwich Bd. of Educ. v. G.M.*, No. 13-CV-235, 2016 WL 3512120, at *15 (D. Conn. June 22, 2016) (explaining program need not be individually crafted for student but should be specially designed to meet student's needs, and finding Windward was designed to address needs of student with language-based learning disability affecting reading skills). Although the SRO noted that there was little evidence of the specific supports provided to L.S. at

Windward, (SRO Decision at 40 n.27), the notion that the Parents must offer evidence as to

L.S.'s specific academic program "calls for too heavy a burden on Parents to establish the

appropriateness of Windward," *G.M.*, 2016 WL 3512120, at *15, and it was apparent that

Windward provides a program designed for children like L.S., who are not cognitively impaired

but have processing deficits like dyslexia.

Finally, although progress does not itself demonstrate that a private placement was

appropriate, *see M.H. v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 2d 125, 163 (S.D.N.Y. 2010), it is a

factor that courts may consider, *see D.C. ex rel. E.B.*, 950 F. Supp. 2d at 513.  The District

argues L.S. regressed during his time at Windward, but the evidence upon which Defendant

relies relates to the 2021-2022 school year.  (*See* D's Mem. at 20; Tr. 553:4-556:13, 559:12-

560:7.)  Defendant ignores the evidence from the 2022-2023 school year, including Dr. Scalzo's

2023 evaluation and L.S.'s scores on standardized tests administered at Windward, which

showed that L.S. made significant academic progress.  (*See* Ps' Ex. LL at 2; Ps' Ex. NN at 4.)[13]

For example, towards the end of the 2022-2023 school year, L.S.'s ability to read single words

improved from the fifth percentile to the twenty-seventh percentile; his ability to read irregular

words improved from the fifth percentile to the thirtieth percentile; his oral reading for

paragraphs improved from the third percentile to the thirtieth percentile; and his ability to decode

nonsense words improved from the fifteenth to the fiftieth percentile so that he was at a fourth-

grade level.  (Ps' Ex. LL at 2.)  As noted above, the SRO similarly ignored this evidence, as he

did not address Dr. Scalzo's evaluation and testimony or L.S.'s test scores.

---

[13] Additionally, Defendant's claim that L.S.'s anxiety worsened after a year at Windward
is not supported by the record.

Accordingly, I find that the SRO's decision finding Windward to be an inappropriate placement was not well-reasoned and thus is not entitled to deference.  *See S.C.*, 175 F. Supp. 3d at 253-54 ("[T]he deference owed to an administrative decision depends on the quality of that opinion."); *M.H.*, 685 F.3d at 252 (SRO's decision that failed to consider highly significant evidence was "precisely the type of determination to which courts need not defer").  By contrast, the IHO considered the evidence that the SRO failed to address, including Dr. Scalzo's two evaluations, and put forth a well-reasoned opinion that is supported by that evidence and is entitled to deference.[14]  *See Scott*, 6 F. Supp. 3d at 444 (deferring to well-reasoned IHO opinion where SRO's opinion was insufficiently reasoned).

Courts have approved decisions based on evidence similar to that on which the IHO relied here, including L.S.'s progress at Windward, the fact that Windward's program was specially designed to meet the needs of students like L.S., and the fact that the program remedied a deficiency identified in the District's proffered program.  *See G.M.*, 2016 WL 3512120, at *15 (program that was designed to address special needs of students like plaintiffs' child was reasonably calculated to enable student to receive educational benefits); *G.B.*, 751 F. Supp. 2d at 581 ("[C]ourts generally uphold private placements where [one element the absence of which caused the public placement to violate IDEA] is present, at least where there is also evidence that

---

[14] Although the IHO's opinion does not discuss lack of related services as it relates to the 2022-2023 school year, the IHO discussed the issue as it related to the 2021-2022 school year, as the SRO noted.  (IHO Decision at 45-47; *see* SRO Decision at 38.)   The IHO found that counseling and OT did not have to be provided during the school day, that L.S. was getting those services privately, and that the small class size and specialized teaching at Windward were alleviating L.S.'s anxiety.  (IHO Decision at 26, 30, 45-47.)  While her discussion of related services was not in as much depth as her detailed discussion of why Windward was the appropriate academic program for L.S., it is plain that the IHO concluded that any cost from the lack of in-school services was outweighed by the benefits of that program, and did not undermine the Parents' showing that Windward was an appropriate placement.

the student progressed at the private school.") (collecting cases); *Jennifer D. ex rel. Travis D. v. N.Y.C. Dep't of Educ.*, 550 F. Supp. 2d 420, 436 (S.D.N.Y. 2008) (finding private placement appropriate where "plaintiff relies not only on the evidence of [the student's] progress . . . , but also on the testimony of several special education professionals that the [private] program was designed to meet [the student's] particular needs"). Thus, deferring to the IHO's decision over the SRO's, the Court holds that Windward was an appropriate placement.

### 2.    Balance of Equities

Under the third prong of the *Burlington/Carter* test, I must determine whether the equities favor Plaintiffs. Because the SRO found Windward was not an appropriate placement, he did not reach this issue. The IHO, however, found in favor of Plaintiffs on that issue. Nevertheless, I need not defer to the IHO because "the substantial deference that the IDEA requires for matters of educational policy is inapplicable to the equitable balancing called for at the third step of the *Burlington/Carter* test." *Ferreira*, 120 F.4th at 332. A court must therefore "(1) engage in an independent review of the administrative record, and (2) make a determination of the balance of the equities based on a preponderance of the evidence." *Id.* at 333.

Plaintiffs argue the equities favor reimbursement because Plaintiffs actively communicated their concerns to the District, collaborated with the District to devise an appropriate IEP, signed all necessary consents, cooperated with the District, sent a timely notice of their intended private placement, and consistently acted in good faith. (Ps' Mem. at 29-30.) The District, on the other hand, argues the equities do not support reimbursement because the Parents never intended to send L.S. to public school, as demonstrated by the fact that the Parents had indicated that they were sending L.S. to Windward five months before the CSE even

convened, and signed a contract and paid a deposit for Windward in February 2022.  (D's Mem. at 21-22.)

Although I may not defer to the IHO's conclusion as to the equities, I may defer to her findings of fact.  *See Ferreira*, 120 F.4th at 333.  The IHO found that the Parents made a $5,000 non-refundable deposit for Windward in February 2022, but were not obligated to pay for the entire school year until July 1, 2022; went into the May 2022 CSE meeting with open minds; and were willing to lose the non-refundable deposit if the District offered an appropriate program. (IHO Decision at 53.)

Based on my independent review of the record, the IHO's factual findings are supported. The Parents' Family Tuition Statement from Windward for the 2022-2023 school year shows that the Parents paid a $5,000 deposit in February 2022 and signed a contract at the same time that stated they could cancel enrollment at any time before July 1, 2022 without penalty aside from the loss of that deposit.  (*See* Ps' Ex. T at 2; Ps' Ex. L at 1.)  Although Defendant asserts that they made another payment of $31,787.50 in May 2022 before the CSE meeting, (D's 56.1 Resp. ¶ 71), the Family Tuition Statement shows they did not make another tuition payment after the initial deposit until July 15, 2022, after the May 2022 CSE meeting.  (*See* Ps' Ex. T at 2.) Further, although Defendant contends the Parents had indicated they would send L.S. to Windward in December 2021, the record shows that the Parents in fact stated in December 2021 that they intended to enroll L.S. in the District.  (*See* D's Ex. 53.)

Additionally, L.S.'s parent explained that they paid the deposit and signed the contract to keep their options open; that spots in the program fill up quickly; that despite paying the $5,000 deposit, the Parents came to every CSE meeting with an open mind; and that they were willing to lose the deposit.  (Tr. 1121:6-1122:5.)  Based on this evidence, which the IHO credited, (IHO

Decision at 53), I am not "persuaded that Plaintiffs engaged in any form of misconduct merely by making a precautionary private school deposit prior to the meeting with public school officials during which the IEP was developed." *T.K.*, 810 F.3d at 879; *see S.C.*, 175 F. Supp. 3d at 268-69 (considering parents' $8,400 deposit and terms of signed contract including that parents had to pay entire tuition unless enrollment canceled by July 1, and concluding it did not demonstrate parents had no intention of considering district placement); *N.Y.C. Dep't of Educ. v. V.S.*, No. 10-CV-05120, 2011 WL 3273922, at *15 (E.D.N.Y. July 29, 2011) (fact that parent signed enrollment contract with private school before CSE meeting and paid partially non-refundable deposit did not indicate parent acted "unilaterally, bereft of any attempt to achieve a negotiated compromise" with the district). The Court could not find any other evidence in the record relevant to whether the Parents had decided to enroll L.S. at Windward regardless of what occurred at the May 2022 CSE meeting, and has no basis to reject the IHO's credibility finding that they were willing to lose the $5,000 deposit (toward tuition of over $68,000, (Ps' Ex. T)), if an appropriate program were offered by Defendant.

The District does not argue that Plaintiffs "obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA," *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 840 (2d Cir. 2014), and I have found no evidence that they acted unreasonably or in bad faith, *see V.S.*, 2011 WL 3273922, at *15 ("[I]t was entirely reasonable for [parent], while working cooperatively with the school district, to also preserve her options by paying a partially refundable deposit to the [private school]."). Instead, the Parents "were actively involved in the formation of the [2022-2023] IEP[], cooperated with District officials, and communicated their objections to [the] IEP" at the CSE meeting. *S.C.*, 175 F. Supp. 3d at 267.

Accordingly, I find that based on a preponderance of the evidence, the equities favor reimbursement.

IV.   **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment is granted in part and denied in part, and Defendant's motion for summary judgment is granted in part and denied in part. Because the District did not offer L.S. a FAPE for the 2022-2023 school year, Windward was an appropriate placement and the equities favor reimbursement, Defendant is ordered to reimburse Plaintiffs for the cost of L.S.'s tuition for his third-grade year at Windward. The parties shall confer on Plaintiffs' application for attorneys' fees, and if they are unable to reach an agreement, they shall, no later than December 31, 2025, submit a joint letter with a proposed briefing schedule on that issue. The Clerk of Court is respectfully requested to terminate the pending motions. (ECF Nos. 27, 32.)

**SO ORDERED.**

Dated:  December 1, 2025
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

75